UNITED GAS IMPROVEMENT COM-
PANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 18112.

United States Court of Appeals
Fifth Circuit.

Feb. 22, 1961.

Rehearings Denied April 6, 1961.

John R. Brown, Circuit Judge, dissented.

J. David Mann, Jr., John E. Holtzing-- er, Jr., Washington, D. C., William E. Zeiter, Philadelphia, Pa., Morgan, Lewis & Bockius, Philadelphia, Pa., and Washington, D. C., of counsel, for United Gas Improvement Co., petitioner.

John C. Mason, Gen. Counsel, F. P. C., Washington, D. C., Howard E. Wahrenbrock, Solicitor, F. P. C., Washington, D. C., Robert L. Russell, Asst. Gen. Counsel, David J. Bardin, Attorney, Federal Power Commission, for Federal Power Commission, respondent.

Kent H. Brown, Atty., Public Service Commission of N. Y., Albany, N. Y., Martin L. Barr, Albany, N. Y., Barbara M. Suchow, New York City, of counsel, for Public Service Commission of New York, applicant for intervention.

W. O. Crain, Gen. Counsel, United Pipe Line Co., C. Huffman Lewis, John M. Madison, Vernon W. Woods, Shreveport, La., for United Gas Pipe Line Co., intervenor.

Martin A. Row, Dallas, Tex., Joiner Cartwright, Herf M. Weinert, Beaumont, Tex., Robert E. May, Omar L. Crook, Washington, D. C., John A. Ward, III, Philadelphia, Pa., Richard F. Generelly, May, Shannon & Morley, Washington, D. C., for Sun Oil Co., intervenor.

Before TUTTLE, Chief Judge, and BROWN and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

This case presents the identical problem heretofore resolved by the Courts of Appeal for the 9th Circuit in United Gas Improvement Co. v. F. P. C., 283 F. 2d 817, and the District of Columbia Circuit in Public Service Commission of New York v. F. P. C., 287 F.2d 146, and now pending after argument in a companion case in the 10th Circuit. Petitioner here also contends that it has been resolved by the United States Supreme Court by directing a reversal (see 361

U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237) of the 3rd Circuit decision in United Gas Improvement Company v. F. P. C., 269 F.2d 865.

The issue is whether the Commission erred in granting a certificate of public necessity and convenience without condition to Sun Oil Company authorizing it to sell gas produced from the Belle Isle Field in Southern Louisiana at an initial base price of 21½¢ per Mcf, plus reimbursement of Louisiana severance and gathering tax of 2.3¢ per Mcf, plus 75% of any new taxes thereafter imposed. The issue must be resolved by a determination whether the Commission observed the standards requiring the "most careful scrutiny and responsible reaction" which the Supreme Court said is required to be given by the Commission to "initial price proposals * * * under Section 7" of the Natural Gas Act, 15 U.S.C.A. § 717f. Atlantic Refining Co. v. Public Service Commission of New York, 360 U.S. 378, 391, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312.

Not only the deference due the studied and careful conclusions of the two other Courts of Appeals, but on our own study of the Atlantic Refining Company case (now known throughout the industry as the CATCO case) compels us to conclude, as the other courts did, that the record before us does not support the determination that the certificate of public necessity and convenience should unconditionally issue in light of the strictures in the CATCO decision.

The essential facts developed in the record before us are: The Sun Oil Company filed an application on May 19, 1958, under Section 7 of the Natural Gas Act, seeking a disclaimer of jurisdiction or in lieu thereof a certificate of public convenience and necessity authorizing the sale of natural gas to the United Gas Pipe Line Company (United) from Sun's onshore production in the Belle Isle Field, St. Mary Parish, Louisiana. Sun is a New Jersey corporation. Its principal place of business is located at Philadelphia, Pennsylvania. Its application was numbered G-15122.

The United Gas Pipe Line Company also filed an application on May 19, 1958, under Section 7 of the Natural Gas Act, seeking a certificate of public convenience and necessity authorizing it to construct and operate certain facilities, estimated to cost $1,176,175.00, to connect with its presently existing natural gas transmission system, which would enable it to purchase, receive and transport in interstate commerce the natural gas produced by Sun in the Belle Isle Field in St. Mary Parish, Louisiana.

By an order issued on January 5, 1959, the Commission permitted the interventions of United Gas Improvement Company and Public Service Commission of New York.

As provided in the Commission notice dated November 26, 1958, a hearing was convened on December 30, 1958, but, on account of the petition to intervene by U.G.I. and the notice of intervention by PSC-NY, was recessed to January 27, 1959, on which date a formal hearing was held and concluded.

The source of the natural gas to be produced by Sun and sold to United, if certificated herein, is from leases or other interests in minerals owned or controlled by Sun in the Belle Isle Field, St. Mary Parish, Louisiana. No gas is to be purchased by Sun from third parties to effectuate this proposed sale. The Belle Isle Field is not a new discovery. The discovery well was drilled in 1940. Since then Sun has drilled some sixty-five or more wells in this field; twenty-one were dry holes. The record shows that at the date of this hearing Sun had in this field eight producing gas wells, twenty-seven producing oil wells and ten temporarily abandoned wells that are to be recompleted as gas wells. There has been continuous exploration in the field since the discovery of the original gas well in 1940. The gas being produced in the Belle Isle Field is sweet, dehydrated gas, the major portion being gas well gas. Under the terms of the sales agreement Sun will dehydrate the gas being sold to United.

United submitted an offer to Sun for the Belle Isle Field gas early in February, 1958. After much negotiating and several bargaining sessions a sales agreement was executed in May, 1958. Each party to the sales agreement was willing and interested in concluding a contract but neither party was under any compulsion to do so. This record shows no affiliation between Sun or United and the two companies have no common officers or directors. United says it conducted its negotiations, which culminated in an agreement, with the objective of purchasing the Belle Isle gas from Sun on terms suitable to United and at the lowest possible price.

United shows it has need of, and a demand for, this Belle Isle gas to meet the present and future requirements of its customers. United now delivers more than one trillion cubic feet of natural gas per year to its customers and the demand on it for additional natural gas increases each year. United agrees to pay, and Sun agrees to sell, the Belle Isle Field natural gas for an initial price of 21.5 cents per Mcf at 15.025 psia plus state taxes, which are shown to be 2.3 cents per Mcf, thus producing a total cost price to United of 23.8 cents per Mcf. The sales agreement provides for 2 cents increase in price per Mcf each four-year period of the twenty-year agreement until a total price of 29.5 cents per Mcf, plus tax, is reached. United says that Belle Isle Field is exceptionally well located for them since it is approximately 12 miles from a United 26-inch and a 30-inch main pipeline. Because of the proximity of this gas to its system main line United was anxious to acquire the total field production feeling it to be in the best interests of its customers by adding this sizeable reserve.

The other sales agreements of United do not contain a "favored nation" clause, hence existing contracts will not be triggered into higher prices by this contract.

United contends, if they expected to purchase this gas, and they maintain they need it, that the demand upon them for additional gas supplies by their present customers requires them to purchase same for the public convenience and necessity, therefore in order to purchase this gas they would be required to offer Sun the current market price, or better, hence the 21.5 cents per Mcf offer.

United's system-wide average cost of gas in 1957 was estimated to be 11.7 cents per Mcf—a United witness testified it had probably gone up a cent or a cent and a half per Mcf in 1958—and this purchase of the Belle Isle Field gas would increase this average cost by less than one tenth of one cent per Mcf. The intervenors contend any certificate issued by the Commission should be conditioned to a maximum of 17 cents to 18 cents per Mcf.

As we have previously stated in Bel Oil Corp. v. F. P. C., 5 Cir., 255 F. 2d 548, 553, a price paid for gas as the result of arm's length bargaining with the producer is not, merely because bargained for in a highly competitive market, "just and reasonable" within the intendment of the Natural Gas Act, 15 U.S.C.A. § 717 et seq. See also New York Public Service Comm. v. F. P. C., D.C.Cir., 287 F.2d 143. This is so because the only justification for giving the Commission the duty to regulate prices was the determination by Congress that the producers have a supply that is so restricted in relation to demand that they have the economic power to bargain for prices that will be injurious to the public. "The purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumers of natural gas." Atlantic Refining Co. v. P. S. C., 360 U.S. 378, 388.

We consider the foregoing comment appropriate at the outset of the discussion of this case, because we perceive that most of the Commission's approach to the certification procedures, until stopped by the Supreme Court in CATCO, was subject to the same criticism which the Commission itself was successfully leveling at the producers in the Section 4 proceedings: that the Commission was permitting the initial filing prices to be fixed by the producers merely on a showing, *so far as price justification was con-*

*cerned*, that they had been bargained for at arm's length, or that they were not higher than a price someone else was then paying in the area.

Thus, at the very threshold of the regulating procedure newly contracting producers were being permitted to charge prices for their gas that were in some instances 30% to 50% higher than earlier prices that were at the very time being suspended by the Commission pending hearings under Section 4 procedures. This inconsistency that concededly arose largely because of the sheer magnitude of the problem of processing the certification proceedings on any other basis, is what the Supreme Court brought in question and corrected in the CATCO decision.

This record discloses that United, the purchaser in this contract from Sun, had been purchasing gas in 1954 at from 9 cents to 12 cents per Mcf in the South Louisiana territory. The testimony of C. C. Barnett, Vice President of United in charge of the gas supply department, as to the move upward from that figure is significant:

"Q. Well, it just seems to me that it can be simply stated that the new high prices do tend to establish new floors for prices. A. Well, I think that you are—you are probably correct in that. I won't go all the way to it, but in about 1954 we were buying gas in South Louisiana at around nine to twelve cents, and Gulf Interstate was certificated and they were paying the enormous amount of 20 cents.

"Q. That is the Erath Field, is it not? A. In the Erath Field. And of course they bought one big package. There was a trillion foot field and they wanted it. So they paid 20 cents for it then.

"About six months or a year later, American Louisiana came in, and instead of paying 20 cents for a trillion foot field they paid 20 cents for smaller fields. And there can be no argument about it that that had brought the price up."

This discussion by the responsible parties who fixed this initial price makes it perfectly plain that a substantial part of the increase from "nine to twelve cents" to $21\frac{1}{2}$ cents resulted from the tremendously increased demand as contrasted with the available supply. In stating that this is plain from the record before us, we, of course, do not say that a substantial part of the increase may not also be attributable to increased costs, nor do we decide that the nine to twelve cents price was a just and reasonable figure. We do know that virtually every increase resulting from escalator clauses or from the operation of "favored nations" provisions in existing contracts was being subjected, during this four year period, to Section 4 hearings for reasonableness.

Apart from any decision of the Supreme Court, it does not seem reasonable or consistent with any understandable policy of Congress that the Commission would, as an illustration, permit the filing of initial price of 20 or $20\frac{1}{2}$ cents, resulting in the collection of that rate until set aside by a Section 5 proceeding (found by the Supreme Court and conceded by all parties to be practically ineffectual because of the volume of business under Section 4) and, on the same day, suspend an automatic increase under an escalation clause from 9 to 15 cents.

In dealing with this problem, the Supreme Court said in Atlantic Refining Co. v. Public Service Commission, supra [360 U.S. 378, 79 S.Ct. 1254]:

"In view of this framework in which the Commission is authorized and directed to act, the initial certificating of a proposal under § 7(e) of the Act as being required by the public convenience and necessity becomes crucial. This is true because the delay incident to determination in § 5 proceedings through which initial certificated rates are reviewable appears nigh interminable. Although Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, was decided in 1954, cases instituted under

§ 5 are still in the investigative stage. This long delay, without the protection of refund, as is possible in a § 4 proceeding, would provide a windfall for the natural gas company with a consequent squall for the consumers. This the Congress did not intend. Moreover, the fact that the Commission was not given the power to suspend initial rates under § 7 makes it the more important, as the Commission itself says, that 'this crucial sale should not be permanently certificated unless the rate level has been shown to be in the public interest,' 17 F.P.C. 563, 575.

\* \* \* \* \* \*

"It is true that the Act does not require a determination of just and reasonable rates in a § 7 proceeding as it does in one under either § 4 or § 5. Nor do we hold that a 'just and reasonable' rate hearing is a prerequisite to the issuance of producer certificates. What we do say is that the inordinate delay presently existing in the processing of § 5 proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7. Their proposals must be supported by evidence showing their necessity to 'the present or future public convenience and necessity' before permanent certificates are issued. This is not to say that rates are the only factor bearing on the public convenience and necessity, for § 7(e) requires the Commission to evaluate all factors bearing on the public interest. The fact that prices have leaped from one plateau to the higher levels of another, as is indicated here, does make price a consideration of prime importance. This is the more important during this formative period when the ground rules of producer regulation are being evolved. Where the application on its face or on presentation of evidence signals the existence of a situation that probably would not be in the public interest, a permanent certificate should not be issued.

"There is, of course, available in such a situation, a method by which the applicant and the Commission can arrive at a rate that is in keeping with the public convenience and necessity. The Congress, in § 7(e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require. Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary."

The parties here belabor the question: what is the "line" as envisaged by the Court in the language quoted above, "out of line" and "hold the line"? The principal question here is whether the line is established by proof of what others are paying under certificates that were either uncontested or were being appealed and are thus "suspect," or what others are paying based on such "suspect" rates, or what even unregulated intrastate purchasers are paying. We agree with much that is said in the Ninth Circuit opinion, supra, which is in turn adopted by the Court of Appeals for the District of Columbia [283 F.2d 824]:

"When an order certificating an initial rate is under court or Commission review, it is possible that the certificate may be eventually denied or price conditions may be attached. In our opinion an existing rate subject to such a hazard does not provide a reasonably reliable basis upon which to predicate a price line. In the event the existing rate is later modified or conditioned as a result of the pending proceedings, the foundation of the line derived therefrom would be undermined. Moreover, the acceptance of ques-

tioned existing prices as a guide in setting the line might itself have the anomalous effect of creating a standard by which the questioned rates would then be judged.

"For the reasons indicated we are of the opinion that it would be an abuse of discretion for the Commission in establishing a price line to rely upon producer prices which are under such a cloud.

"We go further and express the view that where a substantial number of certificated prices are thus under court or Commission review, like prices in the same area though not currently under review ought to be regarded as suspect. In such circumstances it would seem that such similar prices ought not to be relied upon in fixing a line except upon evidence and findings to the effect that they are not subject to the same infirmities which are under test in the pending proceedings."

We think it too plain for argument that the first court tested and court approved certificated sale at a price much higher than any theretofore certificated according to the standards found by the reviewing court to be consonant with CATCO will unquestionably breach "the line." Such, we think, would be the effect of our approval of the certificated price in this case.

█ We do not attempt to determine what the "line" is on this record. We have no doubt that in this case the price of 23.8 cents per Mcf, including the tax reimbursement,[1] was out of line as the term was used by the Supreme Court. The only evidence on this record that supports such "out of line" price is the fact that it was negotiated at arm's length and was required by the intense competition. This, as we have said, is not enough. It was clearly incumbent on the proponent of such a rate to make some showing of the "reason why" (as it was expressed in the CATCO opinion) 21½ cents, excluding tax, is a proper initial rate in 1958 when the parties were freely contracting in 1954 at half that figure.

We are fully aware of the criticism that has been leveled at any regulatory scheme that keeps sums now approaching three quarters of a billion dollars subject to refund pending final determination of just and reasonable rates. However, we take notice of the fact that the log jam is now breaking, as witness the decision in the Phillips Petroleum Company case, F.P.C. Op. No. 338, and it may be hoped that appropriate formulas for resolving the other section 4 cases may soon be forthcoming. The Commission is at least making a strong bid to that end by the publication of its Area Price Level schedules. See Statement of General Policy No. 61–1, issued September 28, 1960.

We conclude that the order here under attack must be set aside and the proceedings remanded for further appropriate action by the Commission.

It is so ordered.

JOHN R. BROWN, Circuit Judge.
I dissent.

JOHN R. BROWN, Circuit Judge (dissenting).

*With the score now four down and none to go[1] and eleven distinguished

---

1. It was testified and the Commission found that the 2.3 cents tax reimbursement was an element of bargaining. Thus, while it may represent actual reimbursement for taxes paid, it is an element of cost to the purchaser, and in negotiating contracts purchasers do not always agree to reimburse the entire tax burden. The agreement here to pay 21½ cents plus full reimbursement for currently collected taxes, was found by the Commission to be a new high rate for United and for the area.

* Editorial note:
This dissenting opinion was also filed in United Gas Improvement Co. v. Federal Power Commission, No. 18113, 290 F.2d 147.

1. Public Service Commission of New York v. F. P. C., D.C.Cir.1960, 287 F.2d 146, Public Service Commission of New York

judges arrayed unanimously against but one, the prospect of a dissent is indeed a formidable one. To the usual one of likely ineffectiveness, it runs the additional risk of marking its author presumptuous, arrogant or ignorant. But with all the deference which this distinguished company of judges inspire, I cannot down the conviction that this decision, and the others on substantially the same record, are wrong. More than that, claiming that the duty to hold the line is imperative because the administrative process creaks with sluggish inefficiencies, the consequence of this action is to add to that delay. That would be a small price, I suppose, were something to be gained. But by the nature of things—and here the "thing" is the *voluntary*, non-compulsory nature of the *first* sale of gas by a producer in the midst of an insatiable expanding demand for gas—the evidence to be offered on remand to the Commission will perhaps have formal attributes making it more imposing, but in actuality it will be what is now known and proved. The Commission will not in fact be better informed on fact. It will merely have a record—probably stupendous in length, in size and number of exhibits and in

avoirdupois weight [2]—to establish what it now knows and on which knowledge Congress declared it was entitled to determine whether the public interest called for the certification of a new sale of gas for resale.

Running through the majority's decision are assumptions or conclusions which I regard as basic errors. The decision misapprehends what it was that CATCO condemned. The opinion mistakenly delineates the mission of the FPC and a reviewing court as one to hold down prices. It erroneously equates regard for the protection of the ultimate consumer with some character of duty to prohibit price increases. In doing so, it loses sight of the fact that neither the FPC nor a reviewing court—including even the highest one—has any power to digress from the statutory duty or standard. Discussing these standards, there is interlaced in every conclusion a confusion of the "just and reasonable" test for rates under §§ 4 and 5 with the requirement for certificating a new service that "is or will be required by the present or future public convenience and necessity * * *," § 7(e).

It is this staggering administrative problem [3] which should itself make us

v. F. P. C., D.C.Cir.1960, 287 F.2d 143; United Gas Improvement Company v. F. P. C., 9 Cir.1960, 283 F.2d 817; United Gas Improvement Company v. F. P. C., 10 Cir.1961, 287 F.2d 159, announced subsequent to the preparation of the majority opinion; and finally the two cases of this Court.

2. The target for criticism of delay and lumbering inefficiency as recent quasi public reports reflect, is generally the administrative agency. But judges hearkening unto advocates protesting the absence of record "proof" must bear some of the responsibility. The problem is of national concern. This is attested by the President's action on the recommendation of the Judicial Conference for the creation of a Permanent Conference on Administrative Procedure. Many share the hope that Chief Judge Prettyman, now active in the formulation of such a conference, will help lead us from a sometime-judge-made wilderness.

3. The FPC in its celebrated opinion No. 338 in the Phillips Petroleum Company rate case [September 28, 1960], 24 FPC ——, Par. 10075 CCH Utilities Law Reporter, took candid note of this. With 3,372 independent producers with rates on file plus 15,435 non-filing co-owners, the Commission had then to deal with 11,091 rate schedules with 33,231 supplements. At that time 3,278 rate increase filings of 570 producers were under suspension awaiting hearing. Unless staff and budget relief is granted, it will take 13 years to dispose of these 2313 cases. In the meantime another 6500 cases would have been filed. This led the Commission to summarize it this way. "Thus, if our present staff were immediately tripled, and if all new employes would be as competent as those we now have, we would not reach a current status in our independent producer rate work until 2043 A.D.—eighty-two and one half years from now. Of course, we could expect to improve our techniques and thus shorten the time re-

cautious lest we add unwittingly to it. What we hold in these two cases, and that by our sister Circuits in the others, note 1, supra, is but the infinitesimal drop in the bucket—perhaps more accurately called a molecule out of trillions of cubic feet of gas. For if this unindicated additional evidence is required in these, so must it be in everyone of the hundreds soon to follow if the ever increasing demand of consumers for more and more gas is to be met. The alternative, of course, is to impose some sort of price condition on every certificate. But that is not administration under law. That is the mechanical application of an arbitrary practice as the easy way out.

I do not think CATCO had any such consequences in mind.

Worse than creating this administrative Jack and the Bean stalk, the requirements of the majority, adopting especially those voiced by the Ninth Circuit, see note 1, supra, brings about an administrative impasse. A local distributing company such as UGI and PSC, whether possessing an opportunity to intervene "as a matter of right," or not, have it within their power to prevent any rate from being considered by the FPC as evidence of an existing "line." If they are allowed to intervene, they may appeal the FPC certification as they have done here. Pending the decision of the appeal, that purchase—because it is somehow under a cloud or is "suspect"—has no legal existence as evidence. If intervention is denied for the reason, say, that the likely impact of such rate on any such distributor is too remote, then that rate may not be used as evidence of the line simply because the one challenging the instant rate was denied the right to attack the prior rate offered as evidence of the line. It is no answer to say that this infirmity terminates when the appellate process in such instances is completed. In the meantime, the current applicant for certificate can get nothing.

He may not use the other rates to prove the increased "line." That means, of course, that the line will remain static, that it may never increase. If CATCO purports to forecast that as a necessary result, I find no basis in the Natural Gas Act for it.

This Court as much as declares that this is required. For the key to its opinion is likely found in these words:

"We think it too plain for argument that the first court tested and court approved certificated sale at a price much higher than any theretofore certificated according to the standards found by the reviewing court to be consonant with CATCO will unquestionably breach 'the line.' Such, we think, would be the effect of our approval of the certificated price in this case."

That has disturbing implications. Does it mean that we have some mission not to decide a case lest it be capable of subsequent use as evidence of a higher "line"? If, as the Court puts it, "the standards found by the reviewing court to be consonant with CATCO" forbid, as the majority and these other cases hold, reliance upon any increased price until such certification is court-approved, how may there ever be a price higher than pre-CATCO?

The fundamental error in all of this is that it is a court intrusion on the expertise committed by Congress to the FPC. Nothing under § 19(b) of the Act makes FPC action a nullity while it is being challenged in court. The record of this Court in denying applications for stay in rate orders shows that we regard Commission decisions as of continuing vitality unless some strong circumstance compels holding them in abeyance. Tennessee Gas Transmission Co. v. F. P. C., 5 Cir., 1960, 283 F.2d 729. Just what is there about this which withholds the imprimatur of law until the judge has spoken? Does the whole machine

quired to process these cases. If we increased our efficiency one thousand percent, we would achieve current status in

1968—eight and two tenths years from now. * * *"

stop when an appeal is taken? In the meantime, what happens to the Commission's serious duty to consider the imperative public interest in obtaining an assured supply to satisfy the insatiable demand for more and more gas?

Of course, I may not ignore the emphatic importance which CATCO attributes to price. But what that case had to deal with reflects no purpose in what was there said to make the § 7 public convenience standard one merely of a simple arithmetical inquiry: is this price higher? Nor was it intended that if the answer were "yes" that that automatically made it contrary to public convenience and necessity thereby setting automatically in train the price condition.

CATCO came up on a bare bones record with some macabre-like implications. There was no proof whatsoever of the need for the gas, the likelihood that it would be lost to the interstate market if the sale were not certificated, or the relation of the proposed 21.4c mcf price to others. Worse than that, it showed that twice the Commission was so disturbed about price that it imposed a price condition. This was followed by its final order in which, under the coercive economic pressures which the nature of this Act gives to non-jurisdictional producers, it capitulated presumably out of regard for what it considered was an imperative need for this large gas supply.

It was this apparent legal indifference to price as an element which was condemned by what the majority calls the "strictures" of CATCO. The element must be taken into account and this "requires a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7." 360 U. S. at page 391, 79 S.Ct. at page 1255. While rates are not the only factor under § 7(e), the historic increase in the cost of gas "does make price a consideration of prime importance." 360 U.S. at page 391, 79 S.Ct. at page 1255. This leads the Court to conclude that "Where the application on its face or on presentation of evidence signals the existence of a situation that probably would not be in the public interest, a permanent certificate should not be issued." 360 U.S. 391, 79 S.Ct. 1255.

But this was certainly no declaration as the law of the Meads and Persians which altereth not, that a price ostensibly higher than the last one ipso facto "signals the existence of a situation * * * not * * * in the public interest * * *." Nor is that to be found in these later comments of the Court. "Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary." 360 U.S. at page 391, 79 S.Ct. 1255.

A price may be higher and yet quite "in line." If thus "in line" it does not come within the category condemned by the Court as one "not in keeping with the public interest." And it is at this point that the nature of the administrative function and the nature of the judicial function be carefully distinguished. What is "out of line" is primarily for the judgment of the administrative agency charged with the effectuation of the total policy of Congress. CATCO now requires that responsible inquiry be made by the FPC. But CATCO does not undertake to spell out just *what* the line is or *how* the Commission is to go about determining it. The term "out of line" —nowhere found in the Natural Gas Act —is a handy colloquialism which, if it means anything at all, must convey the connotation of the more familiar term "abuse of discretion"—i. e., is the proposed increase so great as to indicate arbitrary action without reasonable support in the practicalities of the regulated gas industry?

Obviously the Court could not have meant the term to be, as a matter of law, any price which exceeds in any degree the last and highest one. For that would have been to ignore the unique rate

mechanism of the Natural Gas Act which commits rate *fixing* to the gas producer. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S. Ct. 373, 100 L.Ed. 373; United Gas Pipe Line Co. v. Memphis Light Gas and Water Div., 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153. While any such increase is subject to limited suspension and collection under bond under § 4 and is always subject to review under § 5, automatic stepped up escalation increases become the legally effective rate. The "going rate" is therefore more than the last and most recent § 7 certification of a new sale. It must take into account the geographically relevant currently collectible rates under long existing certificates or rate schedules. This, of course, calls for the nicest of delicate judgments running the whole gamut of the gas industry on the type or kind of gas, the area, field, production problems, volumes and the like.

It is inescapable that there will always be some difference—if not on the day of certification, then at some future time as this complex of thousands of rates undergoes its automatic undulations. The question then is: *who* is to measure the difference? More important, *who* is to determine whether the difference is too much?

The Commission, with the teaching of CATCO before it, considered that these sales were required by the public convenience and necessity and when contrasted with comparable sales, the price was not out of line. Now the majority holds that there is no evidence to support it and remands the case either for more evidence or the imposition of some unindicated conditions. The Court is vague as to the infirmities of the proof. It points out that United's system-wide

average cost was 11.7¢ mcf and that United had been purchasing gas in 1954 at a price from 9 to 12¢ mcf. With so much water over the dam since 1954, I am at a loss to understand how that year has anything to do with a "line" in 1958. Actually, as the opinion reflects in the quoted testimony from United's Vice President, that year marked the beginning of 20¢ gas under certifications for new sales of huge volumes.[4]

While I have some trouble in discerning just what it is the majority concludes, it does not seem likely that it considers this difference of 1½¢ between 20¢ and 21.5¢ as itself "out of line." Somehow the Court wants to ignore the actual fact of those significant certifications which obviously had an influence in subsequent price levels.[5] It concludes that we must go back to 1954 when it says:

> "The only evidence on this record that supports such 'out of line' price is the fact that it was negotiated at arm's length and was required by the intense competition. This, as we have said, is not enough. It was clearly incumbent on the proponent of such a rate to make some showing of the 'reason why' (as it was expressed in the CATCO opinion) 21½ cents, excluding tax, is a proper initial rate in 1958 when the parties were freely contracting in 1954 at half that figure."

Two questions immediately arise: first, how did the Court reach this legal conclusion? Second, what sort of hearing is contemplated on the remand, i. e., what kind of evidence will constitute the "showing of the 'reason why'"?

The first is the more readily answered. Running throughout the Court's opinion is the confusion of the "just and reasonable" standard for rates under §§ 4 and

4. This refers to the certificates issued in 1953 and 1954 in the Matter of Gulf Interstate Gas Company, Docket No. G-2058, opinion 251, 12 FPC 116, May 20, 1953; and the Matter of American Louisiana Pipe Line Company, Docket No. G-2306, opinion 276, 6 PUR 3d 476, October 1, 1954.

5. UGI and PSC acknowledge that the price level increased to at least 17¢ and it is a rate of 17¢ to 18¢ which they suggest as a price condition. They do not, therefore, insist on rolling it back to 1954.

5 with the public convenience and necessity test of § 7. It emphasizes this by stating of our decision in Bel Oil Corp. v. F. P. C., 5 Cir., 1958, 255 F.2d 548, 553, that "A price paid for gas as the result of arm's length bargaining with the producer is not, merely because bargained for in a highly competitive market, 'just and reasonable' within the intendment of the Natural Gas Act." Presumably it is on this that the Court knocks out the undisputed evidence and the categorical finding of the Commission that these contracts were consummated after vigorous, genuine arm's length bargaining. But Bel Oil must be read in the light of our subsequent opinion in Forest Oil Corp. v. F. P. C., 5 Cir., 1959, 263 F.2d 622, 625, which recognizes that the Commission in a rate proceeding is entitled to consider area or field factors.[6] And, of course, no one questions that the price involved here is the area price.

But apart from the intrinsic standard to test "just and reasonable" the majority treats the certification problem as though it were a rate hearing. It does this in the plainest of words. It likens the CATCO criticism of FPC to the Commission's criticism of § 4 rate increases substantiated only by showing of arm's length bargaining and a competitive field price. It follows this with the statement, "Thus, at the very threshold of the regulating procedure newly contracting producers were being permitted to charge prices for their gas that were in some instances 30% to 50% higher than earlier prices that were at the very time being suspended by the Commission pending hearings under Section 4 procedures. * * *" That, in turn, leads it to this main conclusion: "Apart from any decision of the Supreme Court, it does not seem reasonable or consistent with any understandable policy of Congress that the Commission would, as an illustration, permit the filing of initial price of 20 or 20½ cents, resulting in the collection of that rate until set aside by a Section 5 proceeding * * * and, on the same day, suspend an automatic increase under an escalation clause from 9 to 15 cents."

Presumably the majority states "Apart from any decision of the Supreme Court" purposefully. For surely CATCO does not warrant any such conclusion. On the contrary, that decision sought to make

---

6. There we said: "If the Commission finds that a rate is reasonable to the consuming public it need not reject such rate as not being just and reasonable merely because it will yield to a particular producer more than the very minimum required by constitutional standards or more by way of net yield than is returned to another producer in the same well or field, especially if such result follows from a considered decision by the Commission that a uniform price for all the producers or a single well or a single field is not only reasonable but is also highly desirable for convenience of administration. This is what the Commission did in Order No. 310 [Pan American Petroleum Corporation et al.]."

This idea of a field or area price now seems to bear fruition in the Area Price Levels Schedules set forth in the statement of General Policy No. 61–1 September 28, 1960, amended to include South Louisiana October 25, 1960, and now promulgated in the form of an official regulation, see § 2.56 FPC Regulations, 25 F.R. 13969.

Our decision and opinion in that case strongly influenced the Commission in the Phillips Petroleum Company decision opinion No. 338, note 3, supra, in which it abandons the effort to determine rates on the fair rate of return point of departure theory of City of Detroit v. F. P. C., 1956, 97 U.S.App.D.C. 260, 230 F.2d 810. As to this, it said, "If this contention is correct, then, as a practical matter, adequate regulation of producers appears to be impossible under existing law.

"Nowhere in the Natural Gas Act is there as much as one word which indicates that this Commission must use a rate base in determining just and reasonable rates. The correct construction of the Natural Gas Act on this question, both as a legal and as a practical matter has been made by the Court of Appeals of the Fifth Circuit in Forest Oil Corporation v. F. P. C. * * *."

very clear that the two problems were quite distinct and that price was not to be measured in terms of "just and reasonable." The Court states, "It is true that the Act does not require a determination of just and reasonable rates in a § 7 proceeding as it does in one under either § 4 or § 5. Nor do we hold that a 'just and reasonable' rate hearing is a prerequisite to the issuance of producer certificates." 360 U.S. at pages 390–391, 79 S.Ct. at page 1254.

Apart from the CATCO decision the statute itself bears evidence that different things are involved in § 4, § 5 and § 7. It is not for us to say that Congress ought to have made all of the elements of these three sections and the balance of the Act consistent. The standard for a new service or a new sale is not that the proposed price is "just and reasonable" but that the proposed service at the proposed price "is or will be required by the present or future public convenience and necessity." That can account for quite dissimilar actions as between an application for a new certificate and a request to increase a rate under an old one. In the one the standard is public convenience and necessity. As to that, rates are not "the only factor bearing on the public convenience and necessity, for § 7(e) requires the Commission to evaluate all factors bearing on the public interest." 360 U.S. at page 391, 79 S.Ct. at page 1255. In the other the inquiry is what rate is "just and reasonable"?

One thing which surely makes a vital distinction is the difference between the power and the function of the Commission in the one as compared with the other. As to a sale under an existing certificate the gas is dedicated to jurisdictional use for the life of the reserves. Sun Oil Co. v. F. P. C., 1960, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639; Sunray Mid-Continent Oil Co. v. F. P. C., 1960, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed. 2d 1623. The Commission need not concern itself with the availability of that supply of gas. What, and all it need

consider, is the price which will be just and reasonable to producer, consumer and the public alike.

What a different function it bears as to a proposed new sale. A new and perhaps overriding consideration now comes into play. That is the demand for gas. Here it is no longer the relatively "simple" task of drawing the line of just and reasonable. Now the question is not how much to pay, but how badly is this gas needed? At this point it is not for judges to rewrite the law. This may appear to give gas producers an economic ax. But that is the way the law was written. Until the sale is certificated, there is "nothing illegal in the [producers'] rejection of the alternative price proposed by the Commission and their standing firm on their own." 360 U.S. at page 388, 79 S.Ct. at page 1253.

Of course, CATCO now teaches that the Commission may not be overriden completely by this "overriding" consideration. If the price insisted upon is one which the Commission after careful consideration thinks will work a real wrong on the public interest, the minimum it must do is issue a conditional certificate. But there is in this a risk to the vital public interest. Insistence on a price condition in a borderline case may result in the producer withdrawing the application altogether. It is easy to say that if that happens, all well and good, because no one should be given that much power over the control of precious natural resources so badly needed. But what American industry and its exploding metropolitan-based population needs is not such politico-economic platitudes. What it needs is gas. And it is initially in the hands of the Commission to determine whether gas tentatively proffered is finally to be delivered. The risk to the public interest in the possible withdrawal of proposed sales becomes only more acute if, as UGI and PSC urge, and this Court now holds, the Commission should automatically impose a price condition if a price proposed in 1960, or 1970, or 1980 is greater than 1954.

If there ever was a place where truly it could be said that this called for the most expert judgment of those skilled in the problem, this must be one. Not only does it call for a nice balancing of demand and need against possible price impact, but it necessarily calls for a prescience as to the future. United States v. Detroit & Cleveland Navigation Company, 1945, 325 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38. We are dealing with long term contracts which are long term whether so written or not, Sun Oil Company v. F. P. C., 1960, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639. When faced with the problem in 1961 of securing for the interstate regulated market gas reserves in the trillions of cubic feet that will be producing in the year 1980, and conceivably in the year 2000, when our population will be 272,557,000 [7] and over 350 million, I doubt seriously that the Supreme Court meant to declare for all time that a cent or two cents difference between the proffered price and the most recent one, must compel the Commission to risk the loss of this urgently needed gas.

What I am saying is that this must be a judgment for the Commission. Judgment is more than a simple arithmetical comparison of two prices. A considerable latitude must be granted the Commission. This may be safely done for if, in a twilight zone case, the Commission determines that the public interest is best served by securing a perpetual dedication of the gas reserves, it still has the potent remedy of a § 5 hearing. If the Commission is not occupied and preoccupied with useless hearings of the kind we now order, I am confident that it could, with some needed help from Congress for an adequate staff, proceed to expeditious decision on the issue of "just and reasonable" rates.

So we come, as they say in field notes, to the place of beginning. What sort of hearing is to be had on remand?

Surely it will be an affectation to have further proof on the imperative need of United and Transco for this gas. This was no CATCO record. Here the proof abundantly shows the extent of their needs and the supply to satisfy those needs. In the Sun case the reserves are calculated to be 372 billion cubic feet. Sun is dedicating 10,259 acres to the performance of the agreement with United. The majority repeats verbatim with apparent approval the Commission's finding that "United shows it has need of, and a demand for, this Belle Isle gas to meet the present and future requirements of its customers. United now delivers more than one trillion cubic feet of natural gas per year to its customers and the demand on it for additional natural gas increases each year." As to the sale by Superior to Transco, the evidence supports without any serious attack all of the Commission's conclusion. "Transco currently uses approximately one-half trillion cubic feet of natural gas per year. The Superior reserves will meet Transco's system supply for about six months, thereby assisting the company to maintain the inventory of its system gas supply in the face of heavy annual depletion and ever-increasing annual demands by Transco's customers." Superior "owns approximately 30 percent of the dedicated reserves in" this off shore field and by its acquisition of the reserves "Transco has been able to acquire what in the opinion of the company is probably the largest single reserve ever contracted by Transco." The "facts disclose that Southern Louisiana is the only area in which Transco has been able to acquire substantial volumes of uncommitted reserves during the past two years. It has sought unsuccessfully to acquire additional reserves at an initial price of 17¢, and is obliged, if it is to continue to meet the customer requirements it has undertaken to meet, to pay producers in Southern Louisiana a price which will induce them to sell the gas."

7. Statistical Abstract of the United States 1960, No. 3, Projections of the Total Population, at p. 6.

What then about the price? What sort of evidence will there be, and what in reality will it teach, as a "showing of the 'reason why' * * * 21½ cents * * * is a proper initial rate in 1958 when the parties were freely contracting in 1954 at half that figure"?

There may be good basis for deploring it, for wishing that it had not come to pass, but there can be no doubt as to why 21½¢ was agreed upon as the price in 1958. That was the result of the ever-increasing demand for gas and relative lack of supply. This is the result of an interplay of several factors, all of which must be known to the Commission. The first is the tremendous post-war investment in long line transmission system. Billions of dollars have been spent to bring this gas to metropolitan and industrial markets.[8] Gas which, before the war, had little economic value, has increasingly been the subject of an ever-growing demand. The more pipelines built, the more the consuming areas have converted to gas. The greater the conversion, the more the demand.

Had this operated in a traditional public utility field, regulation of the price would have restrained the impact of demand on supply. Here comes into play the second factor. We are not really dealing with a service. An "independent producer," Mr. Justice Harlan pointed out, "is unique among the objects of public-utility regulation because it is not engaged in rendering a service to the public in the conventional sense of that concept, but rather simply in selling a commodity which it owns. * * *" Sunray Oil Co. v. F. P. C., 364 U.S. 137, 160, 80 S.Ct. 1392, 1405, 4 L.Ed.2d 1639 (dissenting). The producer is free of regulation until he sells and is certificated. No one may compel him to sell. He has no duty to sell at a "just and reasonable" co-rate. Indeed, an operator *vis-a-vis* his owners probably has the legal duty to

exact what the traffic will bear. As it is entirely a voluntary thing whether a person wishes to subject himself and his specific gas reserves to public regulation, that decision is normally determined by *price*. Third, as between prospective purchasers, and especially long line transmission systems, there is no public authority to determine who shall have the right to procure gas from a prospective producer-seller. That means that to meet the increasing demand resulting from their expanded facilities (factor one above), the public utility buyers now compete with one another in obtaining gas from the free agent—the producer under no compulsion to sell. Finally, there is competition by intrastate users, and non-jurisdictional industrial users. F. P. C. v. Transcontinental Gas Pipe Line Corp., 1961, 81 S.Ct. 435, 5 L.Ed.2d 377 [January 23, 1961, Nos. 45 & 46].

The proof was uncontradicted that United and Transco had tried earnestly to obtain these needed major supplies of gas at a lower price. They were unsuccessful because this was now the market. No one doubts the sincerity or truthfulness of these witnesses. No one has even faintly suggested that there will be found any witness any where who will say that gas in those volumes under these conditions will be obtainable in Southern Louisiana at the figure now suggested by UGI and PSC of 17–18¢ mcf.

What good then is to be served by a hearing? How can there be any other explanation of the "reason why" gas cannot be purchased in 1958 at 1954 prices? Is the need for a record to substantiate administrative action so much a legal formalism that we compel an overworked and understaffed agency to hold a hearing that will only gild the lilly?

Things would be different had the Commission, as it did in CATCO, capitulated on the element of price. Here against a known, informed judgment

8. I do not for the moment suggest these expenditures constitute an element of the producers' fair price, whether on a rate base or otherwise.

born of long experience and knowledge of the general price levels in the neighborhood of 20¢, it reached the conclusion that this price was consistent with the public convenience and necessity. All of the elaborate evidence, charts and exhibits, economic studies, estimates of gas reserves, and the like cannot possibly change the picture which it knew at the time these orders were entered and which it has known all along.

I look at this as though I were sitting in the Commission's seat. Faced with our order of remand "for further appropriate action," what action should be taken? Hold a hearing to develop what is already known? Hold a hearing to determine that the inevitable is really so, and that producers are free to offer or not offer gas for sale at the current market price? Or is this intended merely as an invitation to impose automatically some kind of price condition? If so, where will it be fixed? Where does the figure 17–18¢ proposed by UGI and PSC come from? Finally, the Commission can well ask, how are we ever to catch up with the staggering load of § 4 and § 5 proceedings if to that burden we must now add two others—a full dress rehearsal hearing for every certification or the equivalent of a § 4 suspension proceeding through the guise of a price condition?[9]

I am confident of only one thing: this case will be back several years and thousands of pages later. No one will know more than is known now.

I therefore respectfully dissent.

Rehearings denied; John R. BROWN, J., dissented.

9. To be effective as a protection for the consumer and at the same time assure ultimate collection by the seller of a "just and reasonable" rate from the time of commencement of the service the conditional certificate would probably take the form of a specified price with a right to file for an immediate increase with or without the five-months' suspension under § 4. This would then take its place with all of the other § 4 pro-

ceedings. During fiscal 1959 the Commission suspended 1,091 rates. At that year end rate filings suspended totaled 2,323. FPC, Thirty-Ninth Annual Report, p. 82 (1959). The FPC's brief tells us that the revenue increments representing the difference between the contingent rates and prior rates exceeded $110 millions in fiscal 1959. Forty percent of gross revenues collected are under § 4 suspensions.