Torbert H. MACDONALD and Sidney R. Yates, Petitioners

v.

FEDERAL POWER COMMISSION, Respondent

George Mitchell & Associates, Inc., et al., Intervenors

No. 73–1715

United States Court of Appeals, District of Columbia Circuit.

Argued June 7, 1974.

Decided Sept. 19, 1974.

Rehearing Denied Dec. 2, 1974.

---

Morton L. Simons, Washington, D. C., with whom Barbara M. Simons, Washington, D. C., was on the brief, for petitioners.

John H. Burnes, Jr., Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Sol., F. P. C., were on the brief, for respondent.

Homer J. Penn, for intervenor George Mitchell & Associates, Inc.

J. Stanley Stroud, Chicago, Ill., was on the brief for intervenor Northern Illinois Gas Co.

Paul E. Goldstein and Paul W. Mallory, Chicago, Ill., were on the brief for intervenor Natural Gas Pipeline Co. of America.

Charles F. Wheatley, Jr., Washington, D. C., entered an appearance for intervenor American Public Gas Assn.

Before WRIGHT and MacKINNON, Circuit Judges, and JAMESON, * Senior District Judge.

* Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

J. SKELLY WRIGHT, Circuit Judge:

■ Petitioner congressmen challenge orders of the Federal Power Commission [1] permitting a natural gas producer, George Mitchell & Associates, to increase its rates for gas sold pursuant to a 1954 contract in interstate commerce to a level about 65 per cent above that which other producers in Mitchell's production area may charge under the Commission's recently established Other Southwest Area rates.[2] Since the Commission justified its grant of "special relief" to Mitchell from the area rate by Mitchell's commitment to invest a certain level of funds in further gas exploration and production, this case requires us to exercise again our responsibility to review the Commission's efforts to respond to the natural gas shortage which all agree now confronts our nation. We recognize the broad discretion which has been entrusted to the Commission "to devise methods of [natural gas] regulation capable of equitably reconciling diverse and conflicting interests," Mobil Oil Corp. v. FPC, 417 U.S. 283, 331, 94 S.Ct. 2328, 2356, 41 L.Ed.2d 72 (1974), and that this discretion must be given

particular respect "in this time of acute energy shortage." *Id.* However, the Supreme Court this year reaffirmed that the purposes of the Natural Gas Act, including that of protecting consumers from prices which are forced above a just and reasonable level by the market power of natural gas suppliers, impose limits on this discretion.[3] And we cannot say on the basis of the record before us that the orders here challenged do not constitute a transgression of those limits.[4]

I

The facts of this case take on greater meaning in the context of the history of federal regulation of natural gas producers. In the first several years after the Supreme Court held the Federal Power Commission to have a responsibility under the Natural Gas Act to regulate gas producers as well as pipelines,[5] the Commission evaluated the justness and reasonableness [6] of a producer's rates by attempting to determine the producer's individual costs, including of course its capital costs, and adding thereto a fair profit return on its investments.[7] In

1. Opinion No. 649, Feb. 21, 1973, Joint Appendix Vol. I at 10; Opinion No. 649–A Denying Rehearing, June 25, 1973, JA Vol. I at 62.

2. Petitioner Congressman Macdonald is a member of the House Committee on Interstate and Foreign Commerce and is chairman of that Committee's Subcommittee on Communications and Power. Petitioner Congressman Yates represents constituents served by the gas for which the rate increase was approved and himself uses this gas. Inasmuch as Congressman Macdonald is not directly and personally aggrieved by the orders, there may be some question concerning his standing to bring this appeal. However, this issue was not raised by the Government and inasmuch as Congressman Yates is clearly aggrieved we need not reach it.

The congressmen petitioned to intervene in the Commission's consideration of the rate increase in order to obtain a rehearing of the Commission's initial order approving the increase. The Commission granted the intervention motion but denied the rehearing. Opinion No. 649–A, *supra* note 1, JA Vol. I at 62.

3. Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72, (1974); FPC v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141, (1974).

4. In addition to attacking the substantive adequacy of the orders approving the rate increase, petitioners contend the Commission violated several of its own regulations in the course of the proceedings which produced these orders. *See* brief for petitioners at 22–24. Given our view of the substantive attack on the orders, it is not necessary to reach consideration of the alleged procedural defects.

5. Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

6. Under § 5(a) of the Natural Gas Act, 15 U.S.C. § 717d(a) (1970), the Commission may at any time conduct an investigation into whether a given rate is "just and reasonable." *See also* 15 U.S.C. § 717c(e) (1970).

7. *See* City of Detroit v. FPC, 97 U.S.App. D.C. 260, 263, 230 F.2d 810, 813 (1955), *cert. denied,* 352 U.S. 829 (1956); Breyer & MacAvoy, The Natural Gas Shortage and the

1960, however, the Commission announced that it would divide the major gas producing regions in the United States into several discrete areas and would initiate proceedings to establish for each of these areas ceilings up to which it would approve producer charges as just and reasonable and above which it would not.[8] In the ensuing area rate proceedings, these price ceilings were fixed by reference to average area-wide costs. This meant that low-cost producers would be able to charge rates appreciably above their individual costs and that high cost producers would be limited to rates which would not permit them to obtain a full fair return on their investments or perhaps even to recoup unsuccessful investment costs.

However, in its first area rate decision, Permian Basin Area Rate Proceeding, 34 FPC 159, 225–226 (1965), the Commission made clear that the area ceilings were not to be ignored whenever a showing was made of inordinate producer costs. The Commission declared it would grant relief from the ceilings only in more limited special circumstances such as "where a producer who has contracted for an above-ceiling price can show that his out-of-pocket expenses in connection with the operation of a particular well are greater than the revenues under the applicable area price." 34 FPC at 226. The Commission stated that there might be other circumstances warranting special relief, but it did not elaborate on what they might be. The Supreme Court approved the Commission's area rate policy as applied in the Permian Basin Area, specifically finding the provisions for special relief to be adequate. Permian Basin Area Rate Cases, 390 U.S. 747, 770–773, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). In subsequent decisions establishing rates for the other gas producing areas, including that for the Other Southwest Area,[9] the Commission provided that special relief from the area rates could be obtained in accordance with its *Permian Basin* precedent.[10]

By October 1971 when the order establishing rates in the Other Southwest Area was entered, the seriousness of our natural gas shortage had become evident to the Commission. In 1969 the Commission had instituted proceedings to reconsider in light of supply shortages the rates which it fixed for the Southern Louisiana Area in 1968.[11] The result of this reconsideration was a 1971 order increasing the ceiling rates for this area and providing incentives for commitment of additional gas to the interstate market.[12] The Commission's 1970 *Hugoton-Anadarko*[13] and its 1971 *Texas Gulf Coast*[14] rate decisions also both provided for increased rate incentives in response to the "present critical shortage of all forms of energy in the United States and the anticipated rapid growth of demand for natural gas."[15] As would be expected, the Commission set the Other Southwest Area rates as well

Regulation of Natural Gas Producers, 86 Harv.L.Rev. 941, 952–953 (1973).

8. *See* Statement of General Policy, No. 61–1, 24 FPC 818 (1960).

9. Other Southwest Area Rate Proceeding, 46 FPC 900, 920 (1970), *affirmed*, 5 Cir., 484 F.2d 469 (1973), *cert. denied*, 417 U.S. 973, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974).

10. The special relief provisions have been codified for each area. For the Other Southwest Area, codification is at 18 C.F.R. § 154.109a(e) (1973).

11. 41 FPC 378 (1969); 42 FPC 1110 (1969).

12. Southern Louisiana Area Rate Proceeding, 46 FPC 86 (1971), *affirmed, sub nom.* Placid Oil Co. v. FPC, 5 Cir., 483 F.2d 880 (1973), *affirmed, sub nom.* Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L. Ed.2d 72 (1974).

13. 44 FPC 761, 781–783 (1970), *affirmed, sub nom.* State of California v. FPC, 9 Cir., 466 F.2d 974 (1972).

14. 45 FPC 674, 687–689, 709–711 (1970), *re-versed, sub nom.* Public Service Com'n v. FPC, 159 U.S.App.D.C. 172, 487 F.2d 1043 (1973), *vacated*, 417 U.S. 964, 94 S.Ct. 3167, 41 L.Ed.2d 1136 (1974).

15. *Id.* at 709.

after full consideration of the gas shortage. The Commission stated:

> While we cannot expect that this area will be able to supply the potential demand upon it, it is important that its potential be fully utilized in this time of national need for all available gas.
>
> \* \* \* \* \* \*
>
> \* \* \* The prices established herein provide incentives, however, to the producers in this marginal area to find gas and dedicate it to interstate commerce. The prices established will enable the interstate market to compete in price with the present and potential intrastate buyers in the area.

46 FPC 900, 910–911, 911–912 (1971). As noted by the Fifth Circuit in approving the Other Southwest Area rate decision,[16] the Commission used average cost levels as its major point of reference but also considered supply and demand imbalance and existing inter- and intrastate price levels in establishing ceiling prices which it judged would provide adequate exploratory incentives.[17] It is from these Other Southwest Area ceiling prices, established in response to the natural gas shortage, that George Mitchell & Associates sought to obtain "special relief."

Mitchell filed its special relief petition less than a year after the Other Southwest Area decision. Under the established area rates Mitchell could sell gas produced from its Wise County region wells pursuant to a 1954 contract with Natural Gas Pipeline Company at 18.-859¢ per Mcf.[18] It requested permission to sell this gas at 30.25¢ per Mcf. In support of its request Mitchell did not argue that the costs of its Wise County area operations are significantly greater than the average costs of gas production in its district of the Other Southwest Area.[19] Indeed it did not offer any evidence on its costs, or on the profitableness of its wells at the rates it was then charging.[20] Rather Mitchell requested the sharply above ceiling rate in return for its promise to undertake additional exploration in the Wise County area.

After a prehearing conference had been commenced and testimony had been placed on the record, a settlement proposal agreed to by the Commission staff and by Natural was submitted by Mitchell to the Commission for its consideration. Two months later the Commission approved the settlement by a two to one vote, there being at the time two vacancies on the five-member Commission.[21]

---

16. In re Other Southwest Area Rate Case (OSWA I), 5 Cir., 484 F.2d 469, 475–476 (1973).

17. 46 FPC 900, 912 (1971).

18. The rates for gathered gas produced in the Other Southwest sub-area of which Wise County is a part pursuant to contracts dated before Oct. 1, 1968 is 19.7¢ per Mcf. See note 19 infra. The rate for ungathered gas in this sub-area, Texas District 9, is 1.5¢ lower, 18.2¢ per Mcf. 46 FPC 900, 921 & n. 2 (1971). Mitchell sells a portion of ungathered gas as well as a portion of gathered gas. The Commission computed the 18.859¢ per Mcf figure taking into account these proportions. The rate for gathered gas produced in Texas District 9 pursuant to a contract dated after Oct. 1, 1968 was fixed at 24¢ per Mcf, id. at 914–915; it is 1.5¢ lower if the gas is ungathered, id. at 919. The Commission apparently assumed that, because the contract between Mitchell and Natural was dated in 1954, any new well gas sold to Natural by Mitchell under an amendment to their contract would be limited by the lower 19.7¢ and 18.2¢ ceilings. See JA Vol. I at 20.

19. The Other Southwest Area is subdivided into several districts or sub-areas. This subdivision is necessary because the Other Southwest Area, unlike the other major production areas, is not homogeneous in its geology and markets. See 46 FPC 900, 907 (1971).

20. Before its request to increase its rates to 30.25¢ per Mcf Mitchell was charging less under its contract with Natural than the area ceilings. Mitchell's pre-request charge was 17.625¢ per Mcf.

21. We are not influenced by Natural's acquiescence in the settlement agreement. As stated by Chairman Nassikas in dissenting from the Commission's order below:

> Natural has neither the incentive to bargain for the lowest reasonable price to the consumer nor the power to do so. Natural can flow-through any increase in its purchased gas costs to its customers.

The settlement reflected closely Mitchell's request for special relief. Mitchell was permitted to charge 30.25¢ per Mcf both for its old flowing gas and for new gas which it had not yet discovered and committed to interstate commerce. Mitchell agreed to drill at least 125 additional wells in the Wise County region covered in the contract between Mitchell and Natural. It agreed to sell in interstate commerce all the gas obtained from such additional drilling to Natural. Mitchell also agreed to expend $16,496,847 on gas or oil exploration within the continental United States in the five years from 1973 through 1977. This $16.5 million commitment is inclusive of the cost of drilling the new wells in the Wise County region.[22] It is estimated that the Wise County drilling will cost close to $9 million. Mitchell agreed to offer to sell to Natural at competitive rates all gas which it discovered in drilling outside the Wise County contract area but within 25 miles of Natural's pipeline in the State of Texas. If Natural fails to accept such an offer, Mitchell must make an effort to sell the gas in the interstate market at a price competitive with the intrastate or local market rate. Mitchell, however, has no obligation to expend any of the $16.5 million not used in drilling the 125 wells in the contract region—an estimated $7.5 million residual—in gas exploration close to

the Natural pipeline, and gas discovered outside 25 miles from the pipeline need not even be offered to the interstate market.

The two-member Commission majority set forth a bare-boned rationale for approval of the settlement. It stressed that, although much evidence indicated the existence of major amounts of untapped gas in the Wise County area, Mitchell had been drilling in the area at a rapidly declining rate. The Commission cited studies which predicted that if no increase in drilling occurred in this region there would be in the years from 1973 to 1977 significant decreases in the gas which could be delivered to Natural from the region. The Commission reasoned that if Natural were forced to obtain its gas elsewhere its ultimate consumers would suffer because of the high price of alternative sources of gas. The Commission explained the hesitancy of Mitchell to locate and produce in the Wise County region by Mitchell's inability in five years to recoup at the rate it could charge under the area ceiling the money it would have to expend in such location and production efforts. The Commission asserted that the 30.25¢ per Mcf rate requested by Mitchell for its sale of both old and new gas would be lower than any price which Natural could obtain from alternative sources[23]

When a pipeline is in curtailment, as Natural is, that buyer has little bargaining leverage. * * * It is difficult to conceive of any "arms-length bargaining" under these circumstances which only adds a greater responsibility to the Commission to examine the justness and reasonableness of the proposed rate.
JA Vol. I at 36.

22. Mitchell did not agree to expend in the next five years $16.5 million more than it had theretofore planned to spend or than it had invested in gas and oil exploration during the previous five-year period. In 1972 Mitchell expended $7 million in exploratory efforts. In 1971 $3.5 million was spent. JA Vol. II at 37. The $16.5 million five-year figure is, of course, equivalent to only $3.3 million annually.

23. Dissenting Chairman Nassikas challenged the Commission's reasoning on this point. The Commission compared the 30.25¢ per Mcf rate with a 33.6¢ per Mcf rate paid by Natural for limited term purchases of intrastate gas and with the costs of nonconventional sources such as liquefied natural gas. JA Vol. I at 19. Chairman Nassikas stressed that the incremental price of the gas expected to be produced by the 125 wells in five years would actually be 50.4¢ per Mcf, rather than 30.25¢, because the price increases on the old flowing gas are really costs to the consumers of the new gas which would not have to be paid if this gas were obtained from an alternative source. JA Vol. I at 30. If less gas than expected is found by drilling the 125 wells, then the incremental gas which is found would, of course, be even more costly per Mcf. Chair-

and would not give Mitchell any "excessive profit returns." [24]

The Commission majority based its statement that Mitchell would not obtain excessive returns from the settlement on a computation which, though disputed by dissenting Chairman Nassikas and by petitioners, indicated that Mitchell in five years would obtain only $3 million in revenues from the rate increase above those funds which it would have to expend in drilling and running the wells.[25] The Commission did not consider the $3 million to be "excessive" because Mitchell was committed to expending in gas or oil exploration $7.5 million beyond that which it would have to expend in the Wise County region on the 125 new wells.[26]

man Nassikas compared the 50.4¢ rate with what was then the average price for intrastate gas from the region around Natural's pipeline—35¢. *See* JA Vol. II at 14. Mitchell argues to this court, however, that the short-term sale price for intrastate gas available to Natural has escalated to 50¢ per Mcf (brief of intervenor Mitchell at 22), and the Commission in its order denying rehearing stressed that when the price increases on the old flowing gas are spread beyond five years over the productive life of the new wells the incremental cost of the new gas is reduced to 33¢ to 36¢ per Mcf. JA Vol. I at 71.

24. JA Vol. I at 23.

25. All parties agreed that, in addition to the almost $9 million estimated to be necessary to drill the 125 wells, Mitchell would be required to expend $2 million over the five-year period for the compression needed to maintain the Wise County field at its present level of deliverability. The Commission staff originally calculated that the rate increase and new Wise County region drilling would yield extra revenues of $18.7 million to Mitchell. JA Vol. II at 110. The staff thus submitted an exhibit indicating that Mitchell would obtain extra estimated profits of $7.7 million from the new drilling ($18.7 million minus $9 million minus $2 million). *Id.* However, after Mitchell objected to this $7.7 million figure at a settlement conference, it was reduced to $3 million, allegedly to take into account *ad valorem* and severance taxes and an allocation of general corporate overhead. Noting that the taxes and corporate overhead could not account for a $4.7 million reduction, Chairman Nassikas found the record inadequate to support the $3 million rather than $7.7 million figure. JA Vol. I at 29 & n. 10.

Petitioners question even the $7.7 million figure. They point out that Mitchell's offer of settlement states that 30 Bcf per year rather than the 21 Bcf per year used in the Commission's calculation will be eligible for the 30.25¢ rate, and that this higher amount would yield extra gross revenues of $24.7 million rather than $18.7 million to Mitchell over the five-year period. *See* brief for petitioners at 8 *and* JA Vol. II at 93.

26. The Commission also stated that Mitchell risked an investment of $11 million in order to obtain a possible $3 million profit. The $11 million figure equals the $9 million thought necessary to drill the 125 new wells plus $2 million required to provide for the compression to maintain the present deliverability of the Wise County region. *See* note 25 *supra.* The risk is that of finding no gas from the drilling. This is a risk which must have been minimal if the unquestioned studies in the record which "reflect that there are substantial quantities of gas in place underlying the Mitchell acreage" are to be given the respect reposed in them by the Commission in stressing the importance of encouraging further development of the field. Opinion No. 649, *supra* note 1, JA Vol. I at 10, 19. And it is a risk which surely has not materialized; Mitchell reported at oral argument that thus far it has in fact been even somewhat more successful in its drilling efforts than was anticipated.

The Commission's risk argument was in any case completely deflated by the dissent of Chairman Nassikas. He pointed out that, even if Mitchell's drilling was completely unsuccessful, the rate increase on the gas flowing from the old wells would yield the producer $7.6 million in additional revenues. He also emphasized that the costs of dry holes would be less than the costs of successful wells. He cited testimony indicating Mitchell would need to expend only $7.5 million for drilling 125 dry holes. JA Vol. I at 32 & n. 24. Mitchell thus would obtain revenues from the rate increase sufficient to pay for the new Wise County region drilling even if that drilling proved completely unsuccessful.

To be sure, Mitchell would still be committed to investing $9 million more over a five-year period in oil or gas exploration. But this investment can be made where Mitchell believes the chances of discovery of oil or gas are best, and per annum it is substantially less than the exploration investment Mitchell has made over the past several years. *See* note 22 *supra.* The Commission

The Commission, however, had no evidence before it on how Mitchell's past costs and profit margins at the rates it had theretofore been charging compared with those of other producers in the Other Southwest Area. There was thus no way in which the Commission could determine from the record of this case what Mitchell's overall profit margin in the Wise County region would be under the 30.25¢ per Mcf rate. The disputed $3 million figure represents only an incremental profit which will derive from the settlement agreement. Furthermore, as stressed by dissenting Chairman Nassikas, in computing even this incremental profit the Commission failed to consider any revenues Mitchell can expect to obtain beyond the five-year period in which it is committed to drilling the 125 wells. Chairman Nassikas, using present value accounting and the best though admittedly inadequate data on Mitchell, computed that if these revenues are acknowledged Mitchell could expect even under the area rates to earn a handsome 20 per cent return on its exploration investment.[27] Chairman Nassikas urged remand of the proceeding for a further hearing before an administrative law judge to develop a record on Mitchell's costs and profit margins. He also argued that the Commission should at least have required all extra revenues beyond those obtainable with area rates to be reinvested in exploration for gas which would have to be dedicated to the interstate market.[28]

## II

We cannot agree with the Commission that the Supreme Court's recent decision in Mobil Oil Corp. v. FPC, *supra,* constrains us to approve the Commission's grant of special relief to Mitchell on the evidentiary record before it. The Commission's action in the instant case goes a significant step beyond that which was given approval in *Mobil Oil.* As explained above at pages 358–359, the Commission has attempted to address the gas shortage by developing area rates which include not only an average area cost base, but also noncost incentives for new gas exploration and production. *Mobil Oil* was an affirmance of the Commission's development of such area rates in the Southern Louisiana Area. Wise County is part of the Other Southwest Area, the rate structure for which was set by the Commission to provide adequate incentives for production in light of the gas shortage. The Other Southwest Area Rate structure was approved in In re Other Southwest Area Rate Case (OSWA I), 5 Cir., 484 F.2d 469 (1973), *cert. denied,* 417 U.S. 973, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (June 18, 1974). Mitchell obtained a special exemption from the Other Southwest Area incentive rate ceilings without developing any evidentiary record to compare its costs and profit margins with the average costs and profit margins in the Other Southwest Area. We cannot conclude under the standards of appellate review of Commission orders set forth in Permian Basin Area Rate Cases, *supra,* and reaffirmed in *Mobil Oil,* that the Commission acted within its discretion in taking this additional step on the record before it.

■ The *Mobil Oil* Court focused upon three criteria of judicial review articulated in *Permian Basin*:

First, [the reviewing court] must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must

---

came close to suggesting at oral argument that any money reinvested in gas exploration should not be considered profit. Such a suggestion would, of course, be specious. Money placed in a capital investment is not necessarily lost to the investor; Mitchell, for example, will own any wells which it drills and will be entitled to a fair return on

their costs. Old profits obtained from consumers provide the capital for new profits.

**27.** JA Vol. I at 33–34. Chairman Nassikas assumed in computing the 20% return that Mitchell would obtain a 100% working interest in the wells it drilled.

**28.** JA Vol. I at 34–36.

examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

Permian Basin Area Rate Cases, *supra*, 390 U.S. at 791–792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 quoted in Mobil Oil Corp. v. FPC, *supra*, 417 U.S. at 307–308, 94 S.Ct. at 345. The Supreme Court in *Mobil Oil* made clear that Courts of Appeals rather than itself have the major responsibility in applying these standards of review, especially that of determining whether substantial evidence supports each of the Commission's findings.[29] "Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals." *Mobil Oil, supra*, 417 U.S. at 310, 94 S.Ct. at 2346, quoting from Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ We cannot find on the basis of the evidentiary record developed by the Commission that it "has given reasoned consideration" and "appropriate protection" to the public interest in not paying prices for gas substantially in excess of those needed to induce production of an adequate gas supply.[30] Though the "substantial evidence" standard has been applied with some flexibility, under any interpretation of its stringency it can be stated that there is not sufficient evidence supporting the Commission's conclusion that Mitchell will not earn an excessive profit charging 30.25% per Mcf on both its old flowing and newly discovered gas in the Wise County region.

■ This deficiency in the Commission's order is critical. Protection of the consumer from profiteering in the gas industry was the primary purpose behind passage of the Natural Gas Act. "It is abundantly clear from the history of the Act and from the events that prompted its adoption that Congress considered that the natural gas industry was heavily concentrated and that monopolistic forces were distorting the market price for natural gas." FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). The "only justification for giving the Commission the duty to regulate prices was the determination by Congress that the producers have a supply that is so restricted in relation to demand that they have the economic power to bargain for prices that will be injurious to the public." United Gas Improvement Co. v. FPC, 5 Cir., 290 F.2d 133, 135, cert. denied, 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed. 2d 27 (1961).[31]

■ The Commission determined early in its regulation of natural gas pro-

---

29. The substantial evidence standard for appellate review of Commission orders derives from § 19(b) of the Natural Gas Act, 15 U. S.C. § 717r(b) (1970).

30. Mobil Oil Corp. v. FPC, *supra* note 3, 417 U.S. at 320–321, 94 S.Ct. at 2351–2352.

31. As the original § 7(c) provided, it was "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." 52 Stat. 825. The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges. Atlantic Refining Co. v. Public Service Com'n (CATCO), 360 U.S. 378, 388, 79 S. Ct. 1246, 3 L.Ed.2d 1312 (1959).

ducers that protection of the consumer from these producers' market power could best be accomplished by setting rates tied to the producers' costs. In this way the producers' return on capital could be computed and held to that rate necessary to call forth needed gas supplies. As traced above, the Commission first set rates on an individual company cost basis before switching to its area-wide average cost policy. The Commission's cost-based approach to regulation obtained unanimous judicial approval. As stated by Judge MacKinnon, "[W]hen the inquiry is whether a given rate is just and reasonable to the consumer, the underlying concern is whether it is *low* enough so that exploitation by the producer is prevented. * * * [N]o factors apart from producers' costs are available to guide efforts to make that determination from the standpoint of the consumer." City of Chicago v. FPC, 147 U.S.App.D.C. 312, 332, 458 F.2d 731, 751, *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1971) (emphasis in original).

■ The courts have also made it clear that the Commission cannot fulfill its "responsibility to maintain adequate supplies at the lowest reasonable rate," Mobil Oil Corp. v. FPC, *supra,* 417 U.S. at 321, 94 S.Ct. at 2352, by assuming without consideration of producers' costs that the market price of gas in unregulated markets is a "just and reasonable" one. As recently as this term the Supreme Court spelled out to the Commission that in "subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could not have assumed that 'just and reasonable' rates could conclusively be determined by reference to market price." FPC v. Texaco, Inc., *supra,* 417

U.S. at 399, 94 S.Ct. at 2327.[32] In this case the Commission could not base a determination that Mitchell's 30.25¢ per Mcf rate for new and old gas was just and reasonable solely on a comparison of this rate with alternative gas prices such as those in the unregulated intrastate gas market. Such a "what the market will bear" approach is simply inconsistent with the Commission's regulatory trust.

We perceive no reason why the special relief provisions in the Commission's area rate orders cannot be utilized to encourage needed gas exploration.[33] But when the Commission permits an individual producer to depart from an area rate structure which has been developed with reference to average area-wide costs to provide producers a necessary but not excessive profit incentive for gas exploration, its regulatory trust requires it to give complete consideration to that producer's individual costs in order to ensure that the producer's profit margin is not thereby raised to an unreasonable level.

The Commission did not give such consideration to the profits Mitchell will obtain from Natural's consumers under a 30.25¢ per Mcf rate. The Commission's discussion of the estimate of the excess of 1973 through 1977 revenues from its rate increase over the costs of the new Wise County drilling surely did not constitute such consideration. As stressed by Chairman Nassikas in his dissent, the new wells drilled in the Wise County region are expected to produce gas for many years beyond 1977 and the revenues, as well as any costs, from the late years of production need to be taken into account on a discounted basis in order to calculate the incremental profit which Mitchell will obtain

32. *See also* City of Chicago v. FPC, 147 U.S.App.D.C. 312, 349–350, 458 F.2d 731, 768–769, cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1971); United Gas Improvement Co. v. FPC, 5 Cir., 290 F.2d 133, 135–136, cert. denied, 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961).

33. Dicta in Placid Oil Co. v. FPC, *supra* note 12, 483 F.2d at 913, and *OSWA I,* *supra* note 16, 484 F.2d at 480 n. 22, referring to the opinions challenged here as a possible application of the Commission's special relief procedure in this time of gas shortage constitute at most a 5th Circuit concurrence in this view.

from the settlement agreement.[34] In addition, the Commission should have obtained past cost data from Mitchell in order to compute the profits which it had been obtaining at its old rate level on its old flowing gas. Because area rates are computed with reference to average costs, it is very possible that these profits were much greater than the average considered reasonable by the Commission for the Other Southwest. Area.[35] Mitchell's incremental profits need to be supplemented with this old profit margin to compute its new profit expectations. Only incremental profits would, of course, be directly relevant to Mitchell's decision whether to invest in additional drilling, but the Commission must consider Mitchell's overall profits to determine the general reasonableness of the rate increase. If Mitchell's profit returns on old flowing gas at its old rate were already above the area average, the Commission might decide that the rate on the newly drilled gas, but not that on the old flowing gas, should be increased so that Mitchell, rather than Natural's ratepaying customers, would bear what seemed the minimal risk of the new drilling being unsuccessful.[36].

A higher overall profit return derived from lower than average costs on the old flowing gas should also be relevant to the Commission's consideration of whether Mitchell's *quid pro quo* for its rate increase—its exploration commitment—is adequate. Higher profit levels would demand a greater gas exploration commitment, and greater support for Chairman Nassikas' position that all gas found by such a commitment be dedicated to the interstate market.[37]

### III

We remand this case to the Commission for reconsideration of the reasonableness of Mitchell's settlement agreement in light of a full evidentiary record on Mitchell's costs of production in the Wise County contract region and the profits which it can expect to obtain over the life of its new and old wells in this region. Inasmuch as Mitchell is now in its second year of drilling toward its 125-well Wise County region commitment and the success ratio of this drilling can be determined, the Commission can make accurate estimates of the amount of gas Mitchell will be able to sell as a result of its exploratory investments.[38]

34. We note that the Commission's exclusive focus on the 1973 through 1977 period for computation of Mitchell's incremental profits was inconsistent with its consideration of the productive life of the new wells for purposes of computing the incremental price of the new gas. *See* note 23 *supra.*

35. The Commission seems to have settled upon a 15% rate of return for producers as reasonable. *See* Other Southwest Area Proceeding, *supra* note 9, 46 FPC at 913 n. 15.

36. *See* note 26 *supra.*

37. Though we do not and need not rest our disposition on this point, like Chairman Nassikas we are troubled by the Commission's failure to require Mitchell to invest in exploration for gas to be dedicated to the interstate market all of its Wise County region revenues in excess of those it would have obtained at the area rate. The excess revenues, at least over the productive life of the wells and perhaps over five years, *see* note 25 *supra*, will be greater than Mitchell's

$16.5 million exploration commitment. Moreover, $7.5 million of the $16.5 million may be directed toward exploration for gas or oil which may never reach the interstate market. A requirement that all the excess revenues be employed to ease the interstate gas shortage would have given symmetry to the purpose of the grant of relief and Mitchell's *quid pro quo* to obtain the relief. The symmetry would have been perfected had the Commission given preemptive rights on the gas obtained from the exploration to Natural whose ratepaying consumers effectively funded the new drilling.

38. The dispute between petitioners and the Commission as to the quantities of gas which Mitchell will be able to sell at the increased rate, *see* note 25 *supra*, should be able to be resolved. The Commission also should fully explain why it reduced its original $7.7 million incremental five-year profit calculation to $3 million. *See id.* It should specify the apportioned corporate overhead and severance and *ad valorem* tax costs.

It is for the Commission to determine that rate level which is necessary to induce Mitchell to complete its drilling in the Wise County region, and it is for the Commission to determine whether the overall profits which Mitchell would obtain at that level are reasonable in light of any commitments to provide further gas for the interstate market.[39] If made within a "zone of reasonableness," [40] we are to respect those determinations [41] as a balancing of public interests within the Commission's discretion.[42] However, these determinations cannot be made without full consideration of Mitchell's costs. Absent such a full consideration, we cannot conclude that the Commission's order granting Mitchell special relief from the area rates is "supported by substantial evidence." [43]

Remanded for further proceedings consistent with this opinion.

MacKINNON, Circuit Judge (concurring):

I concur in the foregoing opinion except as to part of footnote 2. It is my opinion that since Congressman Macdonald is clearly not aggrieved by the order, this court lacks jurisdiction over his petition under section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b). It is unnecessary to consider the further question whether his petition would satisfy the case or controversy requirement of Article III of the Constitution.

---

39. If the Commission decides upon reconsideration that only a rate lower than 30.25¢ per Mcf is justified, it should consider the equities of ordering a refund to Natural of excess revenues already collected to be passed through to the ultimate ratepaying consumers.

40. Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

41. A Commission decision that extra profits are justified by a commitment to explore for more gas would be more clearly within a "zone of reasonableness" if *all* the extra profits were required to be invested in exploration which would benefit the ratepaying consumers who provided the extra profits or at least other consumers who purchase from the interstate market. *See* note 37 *supra.* If such a requirement is not placed on a producer obtaining special relief in a case such as Mitchell's, the Commission should at least fully explain why. The Commission should also consider the exploratory investments which the producer has made over the past few years, *see* note 22 *supra*, to determine whether its commitment to do further exploration is really a *quid pro quo.* The Commission should at least attempt to make the exploratory commitment an incremental one.

42. *See* the language quoted from *Permian Basin, supra* note 40, in text at note 29 *supra.*

