CITIES OF FULTON ET AL., MIS-
SOURI and The Illinois Municipal
Utilities Association, Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent, Panhandle and Pan
Eastern, Intervenor.

No. 73–1294.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 10, 1974.

Decided Jan. 30, 1975.

William T. Miller, Washington, D. C., with whom Charles F. Wheatley, Jr., Washington, D. C., was on the brief for petitioners.

John H. Burnes, Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Acting Sol., F. P. C., were on the brief for respondent.

Raymond N. Shibley, Washington, D. C., with whom James J. Flood, Jr., Houston, Tex., was on the brief for intervenors.

Before BAZELON, Chief Judge, and WRIGHT * and TAMM, Circuit Judges.

BAZELON, Chief Judge:

Petitioners operate municipal gas distribution systems which purchase their entire supply of natural gas from Panhandle Eastern Pipeline Company (Panhandle). They contest the issuance of a certificate of public convenience and necessity to Pan Eastern Exploration Company (Pan Eastern), a wholly owned subsidiary of Panhandle, under section 7 of the Natural Gas Act.[1] Granted September 20, 1972, the certificate authorized Pan Eastern to sell gas under contract to Panhandle, from producing properties transferred to it by Panhandle,[2] at applicable area rates. Consistent with existing FPC policy with respect to production facilities owned or controlled by interstate pipelines, the gas from these

---

* Circuit Judge WRIGHT did not participate in the decision of this case.

1. Opinion and Order Granting Certificates for Abandonment and Transfer of Production Properties and Authorizing Sale of Gas at Applicable Area Rates, FPC Opinion No. 626, Docket Nos. CP 71–237, CI 71–714 (Sept. 20, 1972) [hereinafter cited as FPC Opinion No. 626].

2. The FPC's decision simultaneously granted permission to abandon production from the properties and to transfer them to Pan Eastern. In addition to the working leases, the transfer also included some 47,612 acres of undeveloped leaseholds, which were to provide the setting for the expanded exploration and development program envisioned by the spin-off scheme. FPC Opinion No. 626, *supra* note 1, at 3.

properties had previously been valued for sale on a cost-of-service basis.[3]

The certificate was conditioned to require Pan Eastern to spend the excess over cost-of-service rates, some $43,609,-250 over a five-year period, in the development of new gas reserves.[4] This amount was to be spent over and above amounts already projected by Panhandle for expenditure on exploration and development. Assuming an average exploration and development cost of 11 cents per Mcf, the Commission calculated that Panhandle's scheme would yield 400,000,-000 Mcf of gas that would not otherwise have been available. The Panhandle system was to absorb the reserves generated by this spin-off scheme, and the certificate provided for refunds to Panhandle's customers, at the rate of 11 cents per Mcf, for each Mcf by which Pan Eastern's effort fell short of the 400,-000,000 mark. Pan Eastern was also required, by the terms of the Commission's order, to undertake further exploration and development "to the extent of at least 3 cents per Mcf of recoverable gas reserves and 50 cents per barrel of recoverable oil reserves found as a result of this proposal."[5] The certificate was limited to five years, at the end of which "rates for gas from leases acquired on or before October 7, 1969, will be determined on a cost of service basis, in the

absence of a showing by Applicants that some other method of determination is in the public interest."[6]

## I.

■ There is some dispute over the standard which should govern our review of the Commission's action. The Government and intervenor Panhandle argue strenuously that because this case involves the issuance of a certificate under section 7, the appropriate standard is the "public convenience and necessity" rather than the more stringent "just and reasonable" test applicable in rate-making proceedings under sections 4 and 5 of the Act. We think this contention is substantially foreclosed by Atlantic Refining Co. v. Public Service Commission of New York (CATCO),[7] which strongly suggests that the FPC may not approve under section 7 rates which would not pass muster under section 4.[8] Our view that the "just and reasonable" standard applies, with whatever force it still retains in the wake of recent Supreme Court decisions,[9] finds additional support from a review of events leading to the FPC's decision in this case.

Historically, the Commission has required that pipeline-produced gas be priced to the consumer at cost-of-service. In the course of its *Hugoton-Anadarko Area Rate Proceeding*,[10] the Commission

---

3. The properties had been in production prior to October 7, 1969, the date of decision in Pipeline Production Area Rate Proceedings (Phase I), 42 F.P.C. 738, reh. denied, 42 F.P.C. 1089 (1969), aff'd, City of Chicago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972), which accorded area rate treatment to gas produced by pipelines from leases acquired after that date.

4. The 43,609,250 dollars is the FPC's computation of the difference. Petitioners contend that it falls short of the actual differential by several million dollars. For a full discussion of this contention, see note 31 *infra*.

5. FPC Opinion No. 626, *supra* note 1, at 4.

6. *Id.* at 9.

7. 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

8. What we do say is that the inordinate delay presently existing in the processing of § 5

proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7. Their proposals must be supported by evidence showing their necessity to "the present or future public convenience and necessity" before permanent certificates are issued. . . . Where the application on its face or on presentation of evidence signals the existence of a situation that probably would not be in the public interest, a permanent certificate should not be issued.

*Id.* at 391, 79 S.Ct. at 1291.

9. *E. g.,* Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).

10. 30 F.P.C. 1354 (1963). For a more complete history of FPC proceedings regarding area rates for pipeline-produced gas, see City of Chicago v. FPC, *supra* note 3, 458 F.2d at 737–738.

decided to explore the question of whether gas produced by an interstate pipeline company or its affiliate should be allowed area rate treatment. This inquiry was subsequently severed from the *Hugoton-Anadarko Proceeding* and became the *Pipeline Production Area Rate Proceeding*, Phases I and II. Phase I dealt with the application of area rates to gas produced after the FPC's decision in the matter, which came on October 7, 1969, and granted area rate treatment to new pipeline-produced gas.[11] Phase II, which covered gas produced prior to October 7, 1969, was never formally instituted. In June 1972, the FPC terminated Phase II, indicating its intent to determine the appropriate rates for vintage pipe-produced gas on a "company by company" basis.[12] In the prologue to its opinion in this case, which issued soon afterward in September 1972, the Commission acknowledged that "[t]he applications herein considered represent our first opportunity to implement this new policy."[13]

This progression makes clear that the Panhandle-Pan Eastern proposal was viewed from the outset as nothing more than a device for revising the applicable rates. And, consistent with this, in its opinion denying rehearing, the FPC acknowledged the relevance of the stricter standard: "we are dealing with an adjustment in rates to a level which has been found by the Commission to be just and reasonable."[14] We think it appropriate, under these circumstances, to deal with the order in the terms by which the Commission itself has sought to justify it.

## II.

Of course, "just and reasonable" is not self-defining, and it has proven a particularly difficult test with regard to incentive schemes such as the one before us.[15] We have questioned elsewhere whether those who framed the Natural Gas Act envisioned an alternative to regulation on a traditional cost-of-service basis, which includes a rate of return thought necessary to attract new capital.[16] But the use of selective rate increases as a functional tool to elicit needed supplies was countenanced by the Supreme Court in the *Permian Basin Area Rate Cases*[17] and again in Mobil Oil Co. v. FPC.[18] And *Mobil* made it clear that injections of consumer dollars for this purpose could be drawn from customers relying on supplies already committed to the interstate market. Under the shadow of the nationwide shortage of natural gas, the incentive device has been seized upon increasingly by the FPC and paraded before the courts in a number of guises,[19]

---

11. Pipeline Production Area Rate Proceedings, *supra* note 3.

12. Order Terminating Phase II of Pipeline Production Area Rate Proceeding, 47 F.P.C. 1523 (1972).

13. FPC Opinion No. 626, *supra* note 1, at 2.

14. Opinion and Order Denying Petition for Rehearing, FPC Opinion No. 626–A, Docket Nos. CP 71–237, CI 71–714 (Nov. 17, 1972) [hereinafter cited as FPC Opinion No. 626–A].

15. And there is no doubt that the spin-off can be approved only on an incentive rationale. This leads us to brush aside the Government's suggestion that City of Chicago v. FPC, *supra* note 3, in which we affirmed the FPC's decision to grant area rate treatment to pipeline-controlled production after October 7, 1969, somehow controls the result in this case. Our affirmance in that case rested on the Commission's finding that aggregate production costs for both independents and pipelines would be similar in the future. Here cost-of-service rates for the properties differ from area rates based on average costs for independent producers by nearly 10 cents per Mcf, rendering the principle of *City of Chicago* irrelevant.

16. *See* Public Service Comm'n of N. Y. v. FPC (Texas Gulf Coast Area Rate Cases), 159 U.S.App.D.C. 172, 487 F.2d 1043, 1091 (1973), vacated and remanded sub. nom. Shell Oil Co. v. Public Service Commission of N. Y., 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974).

17. 390 U.S. 747, 815 & n. 98, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

18. *Supra* note 9, 94 S.Ct. at 2351.

19. *E. g.*, contingent escalations and refund work-off credits (upheld in Mobil Oil Corp. v. FPC, *supra* note 9); individual relief from area rates subject to plowback (reviewed in MacDonald v. FPC, 164 U.S.App.D.C. 248, 505 F.2d 355 (D.C.Cir. 1974)); rate base treatment

perhaps on the assumption that the courts would not be inclined to reject them all.

■■ Although we continue to view this spectacle with some skepticism, we are inclined to test these incentive schemes somewhat less rigorously after the *Mobil Oil* decision. The Court in *Mobil* was careful to acknowledge the primary responsibility of the courts of appeals in making the "substantial evidence" determination on review of agency decisions, and since *Mobil*, we have restated our view that this responsibility prevents us from "acquiescing in a charade or a rubber stamping of nonregulation in agency trappings."[20] At the same time, *Mobil* outlined a "broad discretion which has been entrusted to the Commission 'to devise methods of [natural gas] regulation capable of equitably reconciling diverse and conflicting interests,' and [emphasized] that this discretion must be given particular respect 'in this time of acute energy shortage.'"[21] If the bars are not down after *Mobil*, the spaces between them are perceptibly wider. With this in mind, we examine the justification for the FPC's action in this case.

■ As grounds for approving this spin-off scheme, the Commission found that Panhandle's reserves had diminished by more than half since 1961 and that the Panhandle system "anticipated deficiencies of about 100 thousand Mcf per day under existing contracts."[22] The FPC asserts in its brief, and we do not find it refuted by petitioners, that "even if Pan Eastern were able to dedicate 400,000,000 Mcf of gas reserves, additional amounts of gas would be needed from other exploratory efforts to meet annual requirements."[23] In addition to finding a specific need, the FPC also indicated that Panhandle would have to stretch beyond its "financial capabilities" in order to fund a program requiring an equal amount of additional capital by traditional means. Support for this view appears in the testimony of a company consultant who concluded that "reliance upon debt financing for large-scale exploratory efforts is not possible, and that equity financing cannot be considered a solution to the raising of capital for enlarged exploratory programs."[24] And petitioners did not present testimony or exhibits to refute this analysis.[25] We accept the Commission's premises as based on substantial evidence. But that does not conclude the matter. A more detailed scrutiny is required to ensure that the FPC has given "reasoned consideration" to the shaping of its order in an effort to protect consumers from paying substantially more than necessary to bring forth the needed supplies.[26]

### III.

Some perspective on this question is afforded by a comparison of this case

of advance payments from interstate pipelines to producers for the purpose of development of new leases (reviewed in Public Service Comm'n of N. Y. v. FPC, 151 U.S.App.D.C. 307, 467 F.2d 361 (1972)); Public Service Comm'n of N. Y. v. FPC, 167 U.S.App.D.C. ——, 511 F.2d 338 (1975); national area base rate for new gas (promulgated in Opinion and Order Prescribing Uniform National Rate for Sales of Natural Gas Produced from Wells Commenced on or After January 1, 1973, and New Dedications of Natural Gas to Interstate Commerce on or after January 1, 1973, FPC Opinion No. 699, Docket No. R–389–B (June 21, 1974)) [hereinafter cited as FPC, Opinion No. 699].

20. Public Service Comm'n of N. Y., No. 73–1388, *supra*, 167 U.S.App.D.C. ——, 511 F.2d 338, note 19 at 354–355.

21. MacDonald v. FPC, 505 F.2d 355 at 357, *supra* note 19, *quoting* Mobil Oil Corp. v. FPC, *supra* note 9.

22. Opinion No. 626, *supra* note 1, at 7. *See* Testimony of Dan B. Kelly, Joint App. 115.

There was evidence on the record which indicated that this deficiency had developed despite "aggressive gas acquisition activities conducted by both Panhandle and Trunkline" to secure supplies from independent producers as well as to increase company-owned reserves. Testimony of R. C. Dixon, Joint App. 24.

23. Brief for Respondent FPC at 23.

24. Testimony of R. J. Burns, Joint App. 83.

25. *See* Brief for Petitioners Fulton and Macon, Missouri and Illinois Municipal Utilities Ass'n at 7. The Joint Appendix, so far as we have been able to find, contains no cross-examination of Burns by petitioners.

26. *See* Texas Gulf Coast Area Rate Cases, *supra* note 16, at 1098; City of Chicago v. FPC, *supra*, 458 F.2d note 3, at 751.

with MacDonald v. FPC,[27] which was decided by our court shortly after *Mobil*. In the order under review in *MacDonald*, the Commission had authorized the sale of natural gas by an independent producer at 65% above applicable area rates, subject to the producer's agreement to plow back 16.5 million dollars of the excess into new well drilling within the continental United States. Our remand of the case was based on the FPC's failure to consider the producer's individual costs in determining that the scheme would not yield "excessive profit returns."[28] In the case of Panhandle, of course, cost data covering the properties transferred to Pan Eastern were relied on as a major factor in determining the scope of the company's obligation under the scheme. The opinion in *MacDonald* expressed our added concern that there appeared to have been no attempt by the Commission, as there was here, to ensure that *all* the proceeds would be sunk into exploration and development.[29] And we noted the absence of any requirement in that case that all the gas produced as a result of the new exploration be available to the pipeline whose customers would shoulder the increase, or even that it all be committed to the interstate market.[30] Full plowback, combined with Panhandle's preemptive rights to the new gas, gives this case a symmetry

which we found lacking in the *MacDonald* case, and produces a much tighter fit between Panhandle's *quid pro quo* and the purposes for which the Commission acted to grant special relief.

■ The petitioners contend, nevertheless, that the fit is not tight enough to justify the increase, and that three additional conditions were necessary to bring the plan within a zone of reasonableness. We limit full consideration to two of these, as the third was not brought up before the Commission either in the initial hearings or on petition for rehearing.[31]

■ Petitioners advocated before the Commission that a

dollar floor be set for . . . exploration and development expenditures unrelated to the Panhandle-Pan Eastern scheme in order to insure that the consumer-contributed capital raised through the spin-off scheme would represent *additional* [exploration and development] expenses—not mere substitute dollars.[32]

The Commission's order made it clear that commitments under the Pan Eastern spin-off were to be in addition to currently projected programs of exploration and development, which the record indicates are pegged at levels of 10–12

27. *Supra* note 18.

28. *Id.*, 505 F.2d at 365.

29. *Id.*, 505 F.2d n. 37 at 365.

30. *Id.*

31. The third condition was that Pan Eastern be required to invest the "full difference" between cost-of-service and area rates rather than 43,609,250 dollars. The Commission clearly intended that this figure represent the "full difference," but petitioners contend that in its computations, the FPC failed to take into account a 1 cent per Mcf escalation feature in the applicable area rates which became effective on July 1, 1972 and the annual effect of which, by petitioners' calculation, is to increase revenues by 915,000 dollars.

As this contention was not raised before the Commission, it cannot be reached by this court on review absent "reasonable ground for failure to do so." 15 U.S.C. § 717r (1970). The petitioners' explanation is simply that they accepted the Commission's computation of the entire differential as correct and be-

came aware of the mistake only after the Commission had disposed of the petition for rehearing. Reply Brief for Petitioners Fulton and Macon, Missouri and Illinois Municipal Utilities Ass'n at 32. We are reluctant to foreclose petitioners because—for a time at least—they trusted the Commission's arithmetic. But we also hesitate to allow our consideration of the case to turn on a point which the Commission has not had an opportunity to explore. Even if the factual premise of petitioners is correct, and the Commission seems to concede that it is, Panhandle contends that the increase was designed to offset "increase in operating costs and inflationary trends" and therefore that it does not represent a windfall to Panhandle but an increment that will allow it to stay even with changing economic conditions. Brief for Intervenors Panhandle Eastern Pipe Line Company and Pan Eastern Exploration Company at 27 n. 24.

32. Reply Brief of Petitioners Fulton and Macon, Missouri and Illinois Municipal Utilities Ass'n at 29.

million dollars per year.[33] The Commission required Pan Eastern to make annual reports, "describing its program of exploration and development, setting forth the new reserves dedicated, and results of its financial transactions . . .,"[34] and it holds out the possibility of action under section 20 of the Natural Gas Act,[35] should these reports reveal that the company has backed off on its commitment. This machinery, while perhaps not the best, is not plainly inadequate to achieve the Commission's goals.

■ Petitioners also argue that the FPC erred in not requiring that the excess revenues generated by the spin-off scheme be repaid to Panhandle's customers, regardless of whether the 400,000,-000 Mcf goal is reached. In the absence of any such provision, they contend, the 43 million dollars, or at least any portion of it not refunded under the terms of the FPC's order, amounts to a "windfall" to Panhandle's stockholders, or a "double recovery." On rehearing, the Commission dealt with this suggestion as follows:

> [W]e would point out that the phrase "consumer-contributed dollars" is not applicable here. Rather, we are here dealing with an adjustment in rates to a level which has been found by the Commission to be just and reasonable. Consequently no "windfall profit" is involved.[36]

This reasoning carries a strong hint of circularity. There is no "windfall profit" involved because the rates are "just and reasonable" without the full refund provision. The rates are "just and reasonable," in turn, because they promise adequate supplies without "windfall profits." In treating the issue in this conclusory fashion, the Commission misses the

hard questions buried at the root of petitioners' proposal. As we have seen, a major premise of the Commission's action was the absence of alternative sources of investment capital. Consistent with this, why aren't capital-producing payments from customers better conceived of as loans or investments, rather than permanent donations, and allowed to be recouped at some later date? Could Panhandle have lived with other consumer-favoring provisions if full repayment had been imposed? Would the insertion of such a requirement have somehow undermined the overall effectiveness of the plan, as limited by the FPC?

On this last point, Panhandle suggests that a repayment clause of the sort advocated by petitioners would neutralize the existing requirement that Panhandle repay its customers 11 cents for each Mcf by which the program falls short of its goal. The Commission inserted this condition on finding that it

> would provide an incentive to maximize its [Pan Eastern's] effort, as well as insure that Panhandle's customers will not be incurring a higher rate without receiving a compensatory benefit.[37]

Certainly if Panhandle were required to make refunds regardless of the success of Pan Eastern's program, the current provision would provide no incentive. But this rationale only breeds further questions: whether the spur in Pan Eastern's side represented by the current repayment arrangement offers a "compensatory benefit" sufficient to justify the permanent sacrifice of 43 million consumer dollars, or whether the incentive effect might have been achieved in some other way consistent with full refund.[38] These are questions which only

---

**33.** Testimony of R. L. O'Shields, Joint App. 148.

**34.** FPC Opinion No. 626, *supra* note 1, at 10.

**35.** Brief for Respondent FPC at 30.

**36.** FPC Opinion No. 626-A, *supra* note 14, at 3.

**37.** FPC Opinion No. 626, *supra* note 1, at 9.

**38.** *E. g.*, requiring full repayment in any event and repayment with interest on each Mcf short of the 400,000,000 Mcf goal.

As Chairman Nassikas notes in his concurrence, a scheme requiring full refund would work like a transaction involving rate base treatment for advance payments by the pipeline for lease development. The net effect of either arrangement would be to have consumers absorb the opportunity cost of the money

the Commission can properly address. We conclude that in this aspect of its determinations at least the agency fell short of its responsibility to " 'set forth with clarity the grounds for its rejection of opposing views.' " [39]

To remand on this ground alone, however, would discount perhaps too harshly a considered effort by the Commission, reflected in the overall contours of its order, to strike a reasonable accommodation between the requirements of the Panhandle system and the interests of its customers. The proposal which Panhandle put before the Commission was already the result of considerable negotiations between Panhandle and its customers, including petitioners.[40] Even without modification, it offered by the agency's calculation a cheaper alternative to consumers than suffering further

curtailments on the system or importing gas from nonconventional supplies (liquified or synthetic gas).[41] The proposal did not, however, provide for plowback approximating the entire difference between cost-of-service and area rates.[42] Nor did it contain a refund requirement of any kind. Nor was it limited to the five years during which Pan Eastern's exploration and development program was scheduled to run.[43] These features were inserted by the Commission to increase the benefits per consumer dollar and reduce the risks of failure. The FPC also foreclosed resort by Panhandle to the optional certification procedure provided for in section 2.75 of its regulations, ensuring that the gas discovered as a result of the spin-off would not be sold at rates higher than the applicable area rate.[44] These adjustments, together with

(interest) while it was being used to bring on new production. There is some evidence that Panhandle has taken advantage of the advance payments device in advancing over 19.5 million dollars in joint ventures with independent producers as of June 1971. Testimony of R. C. Dixon, Joint App. 122. The degree to which such ventures have not ameliorated Panhandle's supply situation may support the need for a more radical scheme, like the one under review. This, however, is mere speculation on our part and cannot make up for what the Commission itself has failed to supply.

39. Public Service Comm'n of N. Y. v. FPC, *supra* note 16, 487 F.2d at 1098, *quoting* International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 651 (1973) (Bazelon, C. J., concurring in the result).

40. These negotiations resulted in a settlement agreement which was approved by the Commission on December 21, 1971, 46 F.P.C. 1359. Panhandle suggests that "Fulton and Macon, having participated fully in those . . . negotiations and settlement agreement resulting therefrom, cannot be heard to raise new issues or conditions which they bargained away in the rate settlement." Brief for Intervenors Panhandle Eastern Pipe Line Company and Pan Eastern Exploration Company at 23–24. The agreement itself, however, precludes us from giving serious weight to Panhandle's argument:

Nothing contained herein shall be deemed to preclude a party to the proceedings in Docket Nos. CP 71–237 or CI 71–714, aggrieved by the Commission's action in such

proceedings from seeking rehearing, stay or judicial review as to such proceedings.
Joint App. 253.

41. Panhandle, in its Brief on Exceptions, estimates that the instant proposal will result in approximately a 1¢ per Mcf rate increase for its jurisdictional customers. By comparison, it is estimated that for each 100,-000 Mcf per day curtailment, the rate impact would be 1.25¢ per Mcf or approximately 25 percent more than the estimated 1¢ per Mcf impact resulting from the instant proposal. Moreover, Panhandle estimates that the unit rate impact from attaching approximately 100,000 Mcf per day of nonconventional supply of gas (e. g., LNG or SNG) to its system would be between 2¢ per Mcf and 4¢ per Mcf.
FPC Opinion 626, *supra* note 1, at 11. *But see* Reply Brief for Petitioners Fulton and Macon, Missouri and Illinois Municipal Utilities Ass'n at 20.

42. The initial proposal provided for a plowback of 35,000,000 dollars. Opinion No. 626, *supra* note 1, at 4.

43. The initial proposal was for the producing life of the properties, fifteen years. *Id.* at 5.

44. *Id.* at 10. The significance of this limitation is reduced by the promulgation of a national base rate for new gas (produced or otherwise dedicated to the interstate market after January 1, 1973), which now rests at 50 cents per Mcf. FPC Opinion No. 699, *supra* note 18; Opinion and Order on Rehearing Affirming in Part and Modifying in Part Opinion No. 699 and Granting in Part and Denying in Part Petitions for Rehearing, FPC Opinion No. 699–H, Docket No. R–389–B (Dec. 4,

the substantial evidence supporting the Commission's underlying determination of the need for a scheme of this sort, are sufficient in our view to bring the Commission's action within the bounds of its discretion—given the deference which, we are instructed, is to be accorded the agency's determinations in these times of shortage.

In reaching this result, we are also sensitive that the experiment which the Commission has undertaken here is limited in scope. We are not dealing with an area rate structure, as in the *Texas Gulf Coast Area Rate Cases*,[45] or with a regulation of nationwide applicability, as in Public Service Commission of New York v. FPC.[46] Only a portion of a single pipeline's reserves are involved, and the certificate allowing the experiment to go forward is limited to five years, almost half of which has elapsed. During that period the Commission has indicated that it will monitor Pan Eastern's efforts and their impact on Panhandle's supply shortage. Prior to a renewal of Pan Eastern's certificates, it will be in a position to evaluate the results not only against the expectations on which its initial approval was based but also against the performance of pipelines which did not have the benefit of a similar arrangement.

We remain troubled, however, by recent developments in the Commission's regulatory policy which bring into question even now the continued need for the Panhandle-Pan Eastern plan. Chief among these is the adoption of a national base rate [47] applicable to new gas produced by pipelines as well as independents.[48] This order, adopted by the Commission in June 1974, was framed as a response to the "national energy emergency" calculated "to bring forth the requisite supplies to fulfill reasonable demand while protecting 'the consumer against exploitation at the hands of the natural-gas companies.'"[49] As revised, its practical effort is to double the price which Pan Eastern may charge for its new finds.[50] The Commission appears to acknowledge that this development may warrant further scrutiny of the Pan Eastern spin-off.[51] But it may have been reluctant to undertake such scrutiny in formal proceedings while its 1972 orders were under judicial review. Accordingly, we will retain jurisdiction for a period of 90 days for the purpose of allowing the FPC to seek a remand, if so advised, to examine the continued reasonableness of its orders in light of changed circumstances. A remand would also provide an opportunity for

1974) [hereinafter cited as FPC Opinion No. 699–H].

**45.** *Supra* note 16.

**46.** *Supra* note 19.

**47.** FPC Opinion No. 699, *supra* note 18.

**48.** *I. e.*, by virtue of the Commission's action in Pipeline Production Area Rate Proceedings, *supra* note 3. FPC Opinion No. 699–H, *supra* note 43, not only recognizes this, but also broadens the class of pipeline-owned wells that can enjoy the benefit of the new rate. Thus, all the gas produced by Pan Eastern from wells "commenced on or after January 1, 1973" is eligible for sale at 50 cents per Mcf. This is true, of course, both for wells resulting from the expenditure of the 43 million dollars generated by the scheme approved by the FPC in this case and those resulting from money invested from other sources.

**49.** FPC Opinion No. 699, *supra* note 18, at 5, *quoting* Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

**50.** The new national rate is 50 cents per Mcf. FPC Opinion No. 699–H, *supra* note 43. Under the prior dispensation, Pan Eastern would have been able to charge 20 to 21.5 cents for gas found in the Hugoton-Anadarko Area, 44 F.P.C. 761, 787 (1970), and 26 cents for new gas found in the Southern Louisiana Area, 46 F.P.C. 86, 105 (1971), and the Texas Gulf Coast Area, 45 F.P.C. 674, 718 (1971). The Commission's order specifically declined to place geographical limits on Pan Eastern's exploratory effort. FPC Opionion No. 626, *supra* note 1, at 10.

**51.** Brief for Respondent FPC, at 32; Supplemental Brief for Respondent FPC, at 10.

reconsideration of the refund provision proposed by petitioners and rejected by the Commission.[52]

So ordered.

---

**52.** Section 16 of the Natural Gas Act, 15 U.S.C. § 717o, gives the Commission the authority, *inter alia*, to "amend and rescind such . orders as it may find necessary or appropriate" to carry out its responsibilities. This has been interpreted by the Fifth Circuit to include the power to set aside rates once determined by the Commission to be just and reasonable, "when [the Commission] has reason to believe its determinations have been erroneous." Southern Louisiana Rate Cases (I), 428 F.2d 407, 445 (5th Cir.), reh., 444 F.2d 125, cert. denied, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970).